KATZ *v.* UNITED STATES.

No. 35. Argued October 17, 1967.—Decided December 18, 1967.

*Burton Marks* and *Harvey A. Schneider* argued the cause and filed briefs for petitioner.

*John S. Martin, Jr.,* argued the cause for the United States. With him on the brief were *Acting Solicitor General Spritzer, Assistant Attorney General Vinson* and *Beatrice Rosenberg.*

MR. JUSTICE STEWART delivered the opinion of the Court.

The petitioner was convicted in the District Court for the Southern District of California under an eight-count indictment charging him with transmitting wagering information by telephone from Los Angeles to Miami and Boston, in violation of a federal statute.[1] At trial the Government was permitted, over the petitioner's objection, to introduce evidence of the petitioner's end of telephone conversations, overheard by FBI agents who had attached an electronic listening and recording device to the outside of the public telephone booth from which he had placed his calls. In affirming his conviction, the Court of Appeals rejected the contention that the recordings had been obtained in violation of the Fourth Amend-

---

[1] 18 U. S. C. § 1084. That statute provides in pertinent part:

"(a) Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined not more than $10,000 or imprisoned not more than two years, or both.

"(b) Nothing in this section shall be construed to prevent the transmission in interstate or foreign commerce of information for use in news reporting of sporting events or contests, or for the transmission of information assisting in the placing of bets or wagers on a sporting event or contest from a State where betting on that sporting event or contest is legal into a State in which such betting is legal."

ment, because "[t]here was no physical entrance into the area occupied by [the petitioner]." [2] We granted certiorari in order to consider the constitutional questions thus presented.[3]

The petitioner has phrased those questions as follows:

"A. Whether a public telephone booth is a constitutionally protected area so that evidence obtained by attaching an electronic listening recording device to the top of such a booth is obtained in violation of the right to privacy of the user of the booth.

---

[2] 369 F. 2d 130, 134.

[3] 386 U. S. 954. The petition for certiorari also challenged the validity of a warrant authorizing the search of the petitioner's premises. In light of our disposition of this case, we do not reach that issue.

We find no merit in the petitioner's further suggestion that his indictment must be dismissed. After his conviction was affirmed by the Court of Appeals, he testified before a federal grand jury concerning the charges involved here. Because he was compelled to testify pursuant to a grant of immunity, 48 Stat. 1096, as amended, 47 U. S. C. § 409(l), it is clear that the fruit of his testimony cannot be used against him in any future trial. But the petitioner asks for more. He contends that his conviction must be vacated and the charges against him dismissed lest he be "subjected to [a] penalty . . . on account of [a] . . . matter . . . concerning which he [was] compelled . . . to testify . . . ." 47 U. S. C. § 409 (l). *Frank* v. *United States,* 347 F. 2d 486. We disagree. In relevant part, § 409 (l) substantially repeats the language of the Compulsory Testimony Act of 1893, 27 Stat. 443, 49 U. S. C. § 46, which was Congress' response to this Court's statement that an immunity statute can supplant the Fifth Amendment privilege against self-incrimination only if it affords adequate protection from future prosecution or conviction. *Counselman* v. *Hitchcock,* 142 U. S. 547, 585–586. The statutory provision here involved was designed to provide such protection, see *Brown* v. *United States,* 359 U. S. 41, 45–46, not to confer immunity from punishment pursuant to a *prior* prosecution and adjudication of guilt. Cf. *Reina* v. *United States,* 364 U. S. 507, 513–514.

"B. Whether physical penetration of a constitutionally protected area is necessary before a search and seizure can be said to be violative of the Fourth Amendment to the United States Constitution."

We decline to adopt this formulation of the issues. In the first place, the correct solution of Fourth Amendment problems is not necessarily promoted by incantation of the phrase "constitutionally protected area." Secondly, the Fourth Amendment cannot be translated into a general constitutional "right to privacy." That Amendment protects individual privacy against certain kinds of governmental intrusion, but its protections go further, and often have nothing to do with privacy at all.[4] Other provisions of the Constitution protect personal privacy from other forms of governmental invasion.[5] But the protection of a person's *general* right to privacy—his right to be let alone by other people [6]—is, like the

---

[4] "The average man would very likely not have his feelings soothed any more by having his property seized openly than by having it seized privately and by stealth. . . . And a person can be just as much, if not more, irritated, annoyed and injured by an unceremonious public arrest by a policeman as he is by a seizure in the privacy of his office or home." *Griswold* v. *Connecticut*, 381 U. S. 479, 509 (dissenting opinion of Mr. Justice Black).

[5] The First Amendment, for example, imposes limitations upon governmental abridgment of "freedom to associate and privacy in one's associations." *NAACP* v. *Alabama*, 357 U. S. 449, 462. The Third Amendment's prohibition against the unconsented peacetime quartering of soldiers protects another aspect of privacy from governmental intrusion. To some extent, the Fifth Amendment too "reflects the Constitution's concern for . . . '. . . the right of each individual "to a private enclave where he may lead a private life." ' " *Tehan* v. *Shott*, 382 U. S. 406, 416. Virtually every governmental action interferes with personal privacy to some degree. The question in each case is whether that interference violates a command of the United States Constitution.

[6] See Warren & Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193 (1890).

protection of his property and of his very life, left largely to the law of the individual States.[7]

Because of the misleading way the issues have been formulated, the parties have attached great significance to the characterization of the telephone booth from which the petitioner placed his calls. The petitioner has strenuously argued that the booth was a "constitutionally protected area." The Government has maintained with equal vigor that it was not.[8] But this effort to decide whether or not a given "area," viewed in the abstract, is "constitutionally protected" deflects attention from the problem presented by this case.[9] For the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. See *Lewis* v. *United States,* 385 U. S. 206, 210; *United States* v. *Lee,* 274 U. S. 559, 563. But what he seeks·to preserve as private, even in an area accessible to the public, may be constitutionally pro-

---

[7] See, *e. g., Time, Inc.* v. *Hill,* 385 U. S. 374. Cf. *Breard* v. *Alexandria,* 341 U. S. 622; *Kovacs* v. *Cooper,* 336 U. S. 77.

[8] In support of their respective claims, the parties have compiled competing lists of "protected areas" for our consideration. It appears to be common ground that a private home is such an area, *Weeks* v. *United States,* 232 U. S. 383, but that an open field is not. *Hester* v. *United States,* 265 U. S. 57. Defending the inclusion of a telephone booth in his list the petitioner cites *United States* v. *Stone,* 232 F. Supp. 396, and *United States* v. *Madison,* 32 L. W. 2243 (D. C. Ct. Gen. Sess.). Urging that the telephone booth should be excluded, the Government finds support in *United States* v. *Borgese,* 235 F. Supp. 286.

[9] It is true that this Court has occasionally described its conclusions in terms of "constitutionally protected areas," see, *e. g., Silverman* v. *United States,* 365 U. S. 505, 510, 512; *Lopez* v. *United States,* 373 U. S. 427, 438–439; *Berger* v. *New York,* 388 U. S. 41, 57, 59, but we have never suggested that this concept can serve as a talismanic solution to every Fourth Amendment problem.

tected. See *Rios* v. *United States,* 364 U. S. 253; *Ex parte Jackson,* 96 U. S. 727, 733.

The Government stresses the fact that the telephone booth from which the petitioner made his calls was constructed partly of glass, so that he was as visible after he entered it as he would have been if he had remained outside. But what he sought to exclude when he entered the booth was not the intruding eye—it was the uninvited ear. He did not shed his right to do so simply because he made his calls from a place where he might be seen. No less than an individual in a business office,[10] in a friend's apartment,[11] or in a taxicab,[12] a person in a telephone booth may rely upon the protection of the Fourth Amendment. One who occupies it, shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world. To read the Constitution more narrowly is to ignore the vital role that the public telephone has come to play in private communication.

The Government contends, however, that the activities of its agents in this case should not be tested by Fourth Amendment requirements, for the surveillance technique they employed involved no physical penetration of the telephone booth from which the petitioner placed his calls. It is true that the absence of such penetration was at one time thought to foreclose further Fourth Amendment inquiry, *Olmstead* v. *United States,* 277 U. S. 438, 457, 464, 466; *Goldman* v. *United States,* 316 U. S. 129, 134–136, for that Amendment was thought to limit only searches and seizures of tangible

---

[10] *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385.

[11] *Jones* v. *United States,* 362 U. S. 257.

[12] *Rios* v. *United States,* 364 U. S. 253.

property.[13]  But "[t]he premise that property interests control the right of the Government to search and seize has been discredited." *Warden* v. *Hayden,* 387 U. S. 294, 304.  Thus, although a closely divided Court supposed in *Olmstead* that surveillance without any trespass and without the seizure of any material object fell outside the ambit of the Constitution, we have since departed from the narrow view on which that decision rested. Indeed, we have expressly held that the Fourth Amendment governs not only the seizure of tangible items, but extends as well to the recording of oral statements, overheard without any "technical trespass under . . . local property law." *Silverman* v. *United States,* 365 U. S. 505, 511.  Once this much is acknowledged, and once it is recognized that the Fourth Amendment protects people—and not simply "areas"—against unreasonable searches and seizures, it becomes clear that the reach of that Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure.

We conclude that the underpinnings of *Olmstead* and *Goldman* have been so eroded by our subsequent decisions that the "trespass" doctrine there enunciated can no longer be regarded as controlling.  The Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied while using the telephone booth and thus constituted a "search and seizure" within the meaning of the Fourth Amendment.  The fact that the electronic device employed to achieve that end did not happen to penetrate the wall of the booth can have no constitutional significance.

---

[13] See *Olmstead* v. *United States,* 277 U. S. 438, 464–466.  We do not deal in this case with the law of detention or arrest under the Fourth Amendment.

The question remaining for decision, then, is whether the search and seizure conducted in this case complied with constitutional standards. In that regard, the Government's position is that its agents acted in an entirely defensible manner: They did not begin their electronic surveillance until investigation of the petitioner's activities had established a strong probability that he was using the telephone in question to transmit gambling information to persons in other States, in violation of federal law. Moreover, the surveillance was limited, both in scope and in duration, to the specific purpose of establishing the contents of the petitioner's unlawful telephonic communications. The agents confined their surveillance to the brief periods during which he used the telephone booth,[14] and they took great care to overhear only the conversations of the petitioner himself.[15]

Accepting this account of the Government's actions as accurate, it is clear that this surveillance was so narrowly circumscribed that a duly authorized magistrate, properly notified of the need for such investigation, specifically informed of the basis on which it was to proceed, and clearly apprised of the precise intrusion it would entail, could constitutionally have authorized, with appropriate safeguards, the very limited search and seizure that the Government asserts in fact took place. Only last Term we sustained the validity of

[14] Based upon their previous visual observations of the petitioner, the agents correctly predicted that he would use the telephone booth for several minutes at approximately the same time each morning. The petitioner was subjected to electronic surveillance only during this predetermined period. Six recordings, averaging some three minutes each, were obtained and admitted in evidence. They preserved the petitioner's end of conversations concerning the placing of bets and the receipt of wagering information.

[15] On the single occasion when the statements of another person were inadvertently intercepted, the agents refrained from listening to them.

such an authorization, holding that, under sufficiently "precise and discriminate circumstances," a federal court may empower government agents to employ a concealed electronic device "for the narrow and particularized purpose of ascertaining the truth of the . . . allegations" of a "detailed factual affidavit alleging the commission of a specific criminal offense." *Osborn* v. *United States,* 385 U. S. 323, 329–330. Discussing that holding, the Court in *Berger* v. *New York,* 388 U. S. 41, said that "the order authorizing the use of the electronic device" in *Osborn* "afforded similar protections to those . . . of conventional warrants authorizing the seizure of tangible evidence." Through those protections, "no greater invasion of privacy was permitted than was necessary under the circumstances." *Id.,* at 57.[16] Here, too, a similar

---

[16] Although the protections afforded the petitioner in *Osborn* were "*similar* . . . to those . . . of conventional warrants," they were not identical. A conventional warrant ordinarily serves to notify the suspect of an intended search. But if Osborn had been told in advance that federal officers intended to record his conversations, the point of making such recordings would obviously have been lost; the evidence in question could not have been obtained. In omitting any requirement of advance notice, the federal court that authorized electronic surveillance in *Osborn* simply recognized, as has this Court, that officers need not announce their purpose before conducting an otherwise authorized search if such an announcement would provoke the escape of the suspect or the destruction of critical evidence. See *Ker* v. *California,* 374 U. S. 23, 37–41.

Although some have thought that this "exception to the notice requirement where exigent circumstances are present," *id.,* at 39, should be deemed inapplicable where police enter a home before its occupants are aware that officers are present, *id.,* at 55–58 (opinion of Mr. Justice Brennan), the reasons for such a limitation have no bearing here. However true it may be that "[i]nnocent citizens should not suffer the shock, fright or embarrassment attendant upon an unannounced police intrusion," *id.,* at 57, and that "the requirement of awareness . . . serves to minimize the hazards of the officers' dangerous calling," *id.,* at 57–58, these considerations are not rele-

judicial order could have accommodated "the legitimate needs of law enforcement" [17] by authorizing the carefully limited use of electronic surveillance.

The Government urges that, because its agents relied upon the decisions in *Olmstead* and *Goldman,* and because they did no more here than they might properly have done with prior judicial sanction, we should retroactively validate their conduct. That we cannot do. It is apparent that the agents in this case acted with restraint. Yet the inescapable fact is that this restraint was imposed by the agents themselves, not by a judicial officer. They were not required, before commencing the search, to present their estimate of probable cause for detached scrutiny by a neutral magistrate. They were not compelled, during the conduct of the search itself, to observe precise limits established in advance by a specific court order. Nor were they directed, after the search had been completed, to notify the authorizing magistrate in detail of all that had been seized. In the absence of such safeguards, this Court has never sustained a search upon the sole ground that officers reasonably expected to find evidence of a particular crime and voluntarily confined their activities to the least intrusive

---

vant to the problems presented by judicially authorized electronic surveillance.

Nor do the Federal Rules of Criminal Procedure impose an inflexible requirement of prior notice. Rule 41 (d) does require federal officers to serve upon the person searched a copy of the warrant and a receipt describing the material obtained, but it does not invariably require that this be done before the search takes place. *Nordelli* v. *United States,* 24 F. 2d 665, 666–667.

Thus the fact that the petitioner in *Osborn* was unaware that his words were being electronically transcribed did not prevent this Court from sustaining his conviction, and did not prevent the Court in *Berger* from reaching the conclusion that the use of the recording device sanctioned in *Osborn* was entirely lawful. 388 U. S. 41, 57.

[17] *Lopez* v. *United States,* 373 U. S. 427, 464 (dissenting opinion of MR. JUSTICE BRENNAN).

means consistent with that end. Searches conducted without warrants have been held unlawful "notwithstanding facts unquestionably showing probable cause," *Agnello* v. *United States,* 269 U. S. 20, 33, for the Constitution requires "that the deliberate, impartial judgment of a judicial officer . . . be interposed between the citizen and the police . . . ." *Wong Sun* v. *United States,* 371 U. S. 471, 481–482. "Over and again this Court has emphasized that the mandate of the [Fourth] Amendment requires adherence to judicial processes," *United States* v. *Jeffers,* 342 U. S. 48, 51, and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment [18]—subject only to a few specifically established and well-delineated exceptions.[19]

It is difficult to imagine how any of those exceptions could ever apply to the sort of search and seizure involved in this case. Even electronic surveillance substantially contemporaneous with an individual's arrest could hardly be deemed an "incident" of that arrest.[20]

---

[18] See, *e. g., Jones* v. *United States,* 357 U. S. 493, 497–499; *Rios* v. *United States,* 364 U. S. 253, 261; *Chapman* v. *United States,* 365 U. S. 610, 613–615; *Stoner* v. *California,* 376 U. S. 483, 486–487.

[19] See, *e. g., Carroll* v. *United States,* 267 U. S. 132, 153, 156; *McDonald* v. *United States,* 335 U. S. 451, 454–456; *Brinegar* v. *United States,* 338 U. S. 160, 174–177; *Cooper* v. *California,* 386 U. S. 58; *Warden* v. *Hayden,* 387 U. S. 294, 298–300.

[20] In *Agnello* v. *United States,* 269 U. S. 20, 30, the Court stated: "The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody, is not to be doubted."

Whatever one's view of "the long-standing practice of searching for other proofs of guilt within the control of the accused found upon arrest," *United States* v. *Rabinowitz,* 339 U. S. 56, 61; cf. *id.,* at

Nor could the use of electronic surveillance without prior authorization be justified on grounds of "hot pursuit." [21] And, of course, the very nature of electronic surveillance precludes its use pursuant to the suspect's consent.[22]

The Government does not question these basic principles. Rather, it urges the creation of a new exception to cover this case.[23] It argues that surveillance of a telephone booth should be exempted from the usual requirement of advance authorization by a magistrate upon a showing of probable cause. We cannot agree. Omission of such authorization

> "bypasses the safeguards provided by an objective predetermination of probable cause, and substitutes instead the far less reliable procedure of an after-the-event justification for the . . . search, too likely to be subtly influenced by the familiar shortcomings of hindsight judgment." *Beck* v. *Ohio,* 379 U. S. 89, 96.

And bypassing a neutral predetermination of the *scope* of a search leaves individuals secure from Fourth Amend-

---

71–79 (dissenting opinion of Mr. Justice Frankfurter), the concept of an "incidental" search cannot readily be extended to include surreptitious surveillance of an individual either immediately before, or immediately after, his arrest.

[21] Although "[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others," *Warden* v. *Hayden,* 387 U. S. 294, 298–299, there seems little likelihood that electronic surveillance would be a realistic possibility in a situation so fraught with urgency.

[22] A search to which an individual consents meets Fourth Amendment requirements, *Zap* v. *United States,* 328 U. S. 624, but of course "the usefulness of electronic surveillance depends on lack of notice to the suspect." *Lopez* v. *United States,* 373 U. S. 427, 463 (dissenting opinion of MR. JUSTICE BRENNAN).

[23] Whether safeguards other than prior authorization by a magistrate would satisfy the Fourth Amendment in a situation involving the national security is a question not presented by this case.

ment violations "only in the discretion of the police." *Id.*, at 97.

These considerations do not vanish when the search in question is transferred from the setting of a home, an office, or a hotel room to that of a telephone booth. Wherever a man may be, he is entitled to know that he will remain free from unreasonable searches and seizures. The government agents here ignored "the procedure of antecedent justification . . . that is central to the Fourth Amendment," [24] a procedure that we hold to be a constitutional precondition of the kind of electronic surveillance involved in this case. Because the surveillance here failed to meet that condition, and because it led to the petitioner's conviction, the judgment must be reversed.

*It is so ordered.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN joins, concurring.

While I join the opinion of the Court, I feel compelled to reply to the separate concurring opinion of my Brother WHITE, which I view as a wholly unwarranted green light for the Executive Branch to resort to electronic eavesdropping without a warrant in cases which the Executive Branch itself labels "national security" matters.

Neither the President nor the Attorney General is a magistrate. In matters where they believe national security may be involved they are not detached, disinterested, and neutral as a court or magistrate must be. Under the separation of powers created by the Constitution, the Executive Branch is not supposed to be neutral and disinterested. Rather it should vigorously inves-

[24] See *Osborn* v. *United States*, 385 U. S. 323, 330.

tigate and prevent breaches of national security and prosecute those who violate the pertinent federal laws. The President and Attorney General are properly interested parties, cast in the role of adversary, in national security cases. They may even be the intended victims of subversive action. Since spies and saboteurs are as entitled to the protection of the Fourth Amendment as suspected gamblers like petitioner, I cannot agree that where spies and saboteurs are involved adequate protection of Fourth Amendment rights is assured when the President and Attorney General assume both the position of adversary-and-prosecutor and disinterested, neutral magistrate.

There is, so far as I understand constitutional history, no distinction under the Fourth Amendment between types of crimes. Article III, § 3, gives "treason" a very narrow definition and puts restrictions on its proof. But the Fourth Amendment draws no lines between various substantive offenses. The arrests in cases of "hot pursuit" and the arrests on visible or other evidence of probable cause cut across the board and are not peculiar to any kind of crime.

I would respect the present lines of distinction and not improvise because a particular crime seems particularly heinous. When the Framers took that step, as they did with treason, the worst crime of all, they made their purpose manifest.

MR. JUSTICE HARLAN, concurring.

I join the opinion of the Court, which I read to hold only (a) that an enclosed telephone booth is an area where, like a home, *Weeks* v. *United States*, 232 U. S. 383, and unlike a field, *Hester* v. *United States*, 265 U. S. 57, a person has a constitutionally protected reasonable expectation of privacy; (b) that electronic as well as physical intrusion into a place that is in this sense private may constitute a violation of the Fourth Amend-

ment; and (c) that the invasion of a constitutionally protected area by federal authorities is, as the Court has long held, presumptively unreasonable in the absence of a search warrant.

As the Court's opinion states, "the Fourth Amendment protects people, not places." The question, however, is what protection it affords to those people. Generally, as here, the answer to that question requires reference to a "place." My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable." Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the "plain view" of outsiders are not "protected" because no intention to keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable. Cf. *Hester* v. *United States, supra.*

The critical fact in this case is that "[o]ne who occupies it, [a telephone booth] shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume" that his conversation is not being intercepted. *Ante,* at 352. The point is not that the booth is "accessible to the public" at other times, *ante,* at 351, but that it is a temporarily private place whose momentary occupants' expectations of freedom from intrusion are recognized as reasonable. Cf. *Rios* v. *United States,* 364 U. S. 253.

In *Silverman* v. *United States,* 365 U. S. 505, we held that eavesdropping accomplished by means of an electronic device that penetrated the premises occupied by petitioner was a violation of the Fourth Amendment.

That case established that interception of conversations reasonably intended to be private could constitute a "search and seizure," and that the examination or taking of physical property was not required. This view of the Fourth Amendment was followed in *Wong Sun* v. *United States,* 371 U. S. 471, at 485, and *Berger* v. *New York,* 388 U. S. 41, at 51. Also compare *Osborn* v. *United States,* 385 U. S. 323, at 327. In *Silverman* we found it unnecessary to re-examine *Goldman* v. *United States,* 316 U. S. 129, which had held that electronic surveillance accomplished without the physical penetration of petitioner's premises by a tangible object did not violate the Fourth Amendment. This case requires us to reconsider *Goldman,* and I agree that it should now be overruled.* Its limitation on Fourth Amendment protection is, in the present day, bad physics as well as bad law, for reasonable expectations of privacy may be defeated by electronic as well as physical invasion.

Finally, I do not read the Court's opinion to declare that no interception of a conversation one-half of which occurs in a public telephone booth can be reasonable in the absence of a warrant. As elsewhere under the Fourth Amendment, warrants are the general rule, to which the legitimate needs of law enforcement may demand specific exceptions. It will be time enough to consider any such exceptions when an appropriate occasion presents itself, and I agree with the Court that this is not one.

MR. JUSTICE WHITE, concurring.

I agree that the official surveillance of petitioner's telephone conversations in a public booth must be sub-

---

*I also think that the course of development evinced by *Silverman, supra, Wong Sun, supra, Berger, supra,* and today's decision must be recognized as overruling *Olmstead* v. *United States,* 277 U. S. 438, which essentially rested on the ground that conversations were not subject to the protection of the Fourth Amendment.

jected to the test of reasonableness under the Fourth Amendment and that on the record now before us the particular surveillance undertaken was unreasonable absent a warrant properly authorizing it. This application of the Fourth Amendment need not interfere with legitimate needs of law enforcement.*

In joining the Court's opinion, I note the Court's acknowledgment that there are circumstances in which it is reasonable to search without a warrant. In this connection, in footnote 23 the Court points out that today's decision does not reach national security cases. Wiretapping to protect the security of the Nation has been authorized by successive Presidents. The present Administration would apparently save national security cases from restrictions against wiretapping. See *Berger* v. *New York,* 388 U. S. 41, 112–118 (1967) (WHITE, J.,

---

*In previous cases, which are undisturbed by today's decision, the Court has upheld, as reasonable under the Fourth Amendment, admission at trial of evidence obtained (1) by an undercover police agent to whom a defendant speaks without knowledge that he is in the employ of the police, *Hoffa* v. *United States,* 385 U. S. 293 (1966); (2) by a recording device hidden on the person of such an informant, *Lopez* v. *United States,* 373 U. S. 427 (1963); *Osborn* v. *United States,* 385 U. S. 323 (1966); and (3) by a policeman listening to the secret micro-wave transmissions of an agent conversing with the defendant in another location, *On Lee* v. *United States,* 343 U. S. 747 (1952). When one man speaks to another he takes all the risks ordinarily inherent in so doing, including the risk that the man to whom he speaks will make public what he has heard. The Fourth Amendment does not protect against unreliable (or law-abiding) associates. *Hoffa* v. *United States, supra.* It is but a logical and reasonable extension of this principle that a man take the risk that his hearer, free to memorize what he hears for later verbatim repetitions, is instead recording it or transmitting it to another. The present case deals with an entirely different situation, for as the Court emphasizes the petitioner "sought to exclude . . . the uninvited ear," and spoke under circumstances in which a reasonable person would assume that uninvited ears were not listening.

dissenting). We should not require the warrant procedure and the magistrate's judgment if the President of the United States or his chief legal officer, the Attorney General, has considered the requirements of national security and authorized electronic surveillance as reasonable.

MR. JUSTICE BLACK, dissenting.

If I could agree with the Court that eavesdropping carried on by electronic means (equivalent to wiretapping) constitutes a "search" or "seizure," I would be happy to join the Court's opinion. For on that premise my Brother STEWART sets out methods in accord with the Fourth Amendment to guide States in the enactment and enforcement of laws passed to regulate wiretapping by government. In this respect today's opinion differs sharply from *Berger* v. *New York,* 388 U. S. 41, decided last Term, which held void on its face a New York statute authorizing wiretapping on warrants issued by magistrates on showings of probable cause. The *Berger* case also set up what appeared to be insuperable obstacles to the valid passage of such wiretapping laws by States. The Court's opinion in this case, however, removes the doubts about state power in this field and abates to a large extent the confusion and near-paralyzing effect of the *Berger* holding. Notwithstanding these good efforts of the Court, I am still unable to agree with its interpretation of the Fourth Amendment.

My basic objection is twofold: (1) I do not believe that the words of the Amendment will bear the meaning given them by today's decision, and (2) I do not believe that it is the proper role of this Court to rewrite the Amendment in order "to bring it into harmony with the times" and thus reach a result that many people believe to be desirable.

While I realize that an argument based on the meaning of words lacks the scope, and no doubt the appeal, of broad policy discussions and philosophical discourses on such nebulous subjects as privacy, for me the language of the Amendment is the crucial place to look in construing a written document such as our Constitution. The Fourth Amendment says that

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The first clause protects "persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." These words connote the idea of tangible things with size, form, and weight, things capable of being searched, seized, or both. The second clause of the Amendment still further establishes its Framers' purpose to limit its protection to tangible things by providing that no warrants shall issue but those "particularly describing the place to be searched, and the persons or things to be seized." A conversation overheard by eavesdropping, whether by plain snooping or wiretapping, is not tangible and, under the normally accepted meanings of the words, can neither be searched nor seized. In addition the language of the second clause indicates that the Amendment refers not only to something tangible so it can be seized but to something already in existence so it can be described. Yet the Court's interpretation would have the Amendment apply to overhearing future conversations which by their very nature are nonexistent until they take place. How can one "describe" a future conversation, and, if one cannot, how can a magistrate issue a warrant to eavesdrop one in the future? It is argued that information showing what

is expected to be said is sufficient to limit the boundaries of what later can be admitted into evidence; but does such general information really meet the specific language of the Amendment which says "particularly describing"? Rather than using language in a completely artificial way, I must conclude that the Fourth Amendment simply does not apply to eavesdropping.

Tapping telephone wires, of course, was an unknown possibility at the time the Fourth Amendment was adopted. But eavesdropping (and wiretapping is nothing more than eavesdropping by telephone) was, as even the majority opinion in *Berger, supra,* recognized, "an ancient practice which at common law was condemned as a nuisance. 4 Blackstone, Commentaries 168. In those days the eavesdropper listened by naked ear under the eaves of houses or their windows, or beyond their walls seeking out private discourse." 388 U. S., at 45. There can be no doubt that the Framers were aware of this practice, and if they had desired to outlaw or restrict the use of evidence obtained by eavesdropping, I believe that they would have used the appropriate language to do so in the Fourth Amendment. They certainly would not have left such a task to the ingenuity of language-stretching judges. No one, it seems to me, can read the debates on the Bill of Rights without reaching the conclusion that its Framers and critics well knew the meaning of the words they used, what they would be understood to mean by others, their scope and their limitations. Under these circumstances it strikes me as a charge against their scholarship, their common sense and their candor to give to the Fourth Amendment's language the eavesdropping meaning the Court imputes to it today.

I do not deny that common sense requires and that this Court often has said that the Bill of Rights' safeguards should be given a liberal construction. This

principle, however, does not justify construing the search and seizure amendment as applying to eavesdropping or the "seizure" of conversations. The Fourth Amendment was aimed directly at the abhorred practice of breaking in, ransacking and searching homes and other buildings and seizing people's personal belongings without warrants ᐟissued by magistrates. The Amendment deserves, and this Court has given it, a liberal construction in order to protect against warrantless searches of buildings and seizures of tangible personal effects. But until today this Court has refused to say that eavesdropping comes within the ambit of Fourth Amendment restrictions. See, *e. g., Olmstead* v. *United States,* 277 U. S. 438 (1928), and *Goldman* v. *United States,* 316 U. S. 129 (1942).

So far I have attempted to state why I think the words of the Fourth Amendment prevent its application to eavesdropping. It is important now to show that this has been the traditional view of the Amendment's scope since its adoption and that the Court's decision in this case, along with its amorphous holding in *Berger* last Term, marks the first real departure from that view.

The first case to reach this Court which actually involved a clear-cut test of the Fourth Amendment's applicability to eavesdropping through a wiretap was, of course, *Olmstead, supra.* In holding that the interception of private telephone conversations by means of wiretapping was not a violation of the Fourth Amendment, this Court, speaking through Mr. Chief Justice Taft, examined the language of the Amendment and found, just as I do now, that the words could not be stretched to encompass overheard conversations:

> "The Amendment itself shows that the search is to be of material things—the person, the house, his papers or his effects. The description of the warrant necessary to make the proceeding lawful, is

that it must specify the place to be searched and the person or *things* to be seized. . . .

.        .        .        .        .

"Justice Bradley in the *Boyd* case [*Boyd* v. *United States,* 116 U. S. 616], and Justice Clark[e] in the *Gouled* case [*Gouled* v. *United States,* 255 U. S. 298], said that the Fifth Amendment and the Fourth Amendment were to be liberally construed to effect the purpose of the framers of the Constitution in the interest of liberty.  But that can not justify enlargement of the language employed beyond the possible practical meaning of houses, persons, papers, and effects, or so to apply the words search and seizure as to forbid hearing or sight." 277 U. S., at 464–465.

*Goldman* v. *United States,* 316 U. S. 129, is an even clearer example of this Court's traditional refusal to consider eavesdropping as being covered by the Fourth Amendment.  There federal agents used a detectaphone, which was placed on the wall of an adjoining room, to listen to the conversation of a defendant carried on in his private office and intended to be confined within the four walls of the room.  This Court, referring to *Olmstead,* found no Fourth Amendment violation.

It should be noted that the Court in *Olmstead* based its decision squarely on the fact that wiretapping or eavesdropping does not violate the Fourth Amendment. As shown, *supra,* in the cited quotation from the case, the Court went to great pains to examine the actual language of the Amendment and found that the words used simply could not be stretched to cover eavesdropping. That there was no trespass was not the determinative factor, and indeed the Court in citing *Hester* v. *United States,* 265 U. S. 57, indicated that even where there was a trespass the Fourth Amendment does not automatically apply to evidence obtained by "hearing or

sight." The *Olmstead* majority characterized *Hester* as holding "that the testimony of two officers of the law who trespassed on the defendant's land, concealed themselves one hundred yards away from his house and saw him come out and hand a bottle of whiskey to another, was not inadmissible. While there was a trespass, there was no search of person, house, papers or effects." 277 U. S., at 465. Thus the clear holding of the *Olmstead* and *Goldman* cases, undiluted by any question of trespass, is that eavesdropping, in both its original and modern forms, is not violative of the Fourth Amendment.

While my reading of the *Olmstead* and *Goldman* cases convinces me that they were decided on the basis of the inapplicability of the wording of the Fourth Amendment to eavesdropping, and not on any trespass basis, this is not to say that unauthorized intrusion has not played an important role in search and seizure cases. This Court has adopted an exclusionary rule to bar evidence obtained by means of such intrusions. As I made clear in my dissenting opinion in *Berger* v. *New York,* 388 U. S. 41, 76, I continue to believe that this exclusionary rule formulated in *Weeks* v. *United States,* 232 U. S. 383, rests on the "supervisory power" of this Court over other federal courts and is not rooted in the Fourth Amendment. See *Wolf* v. *Colorado,* concurring opinion, 338 U. S. 25, 39, at 40. See also *Mapp* v. *Ohio,* concurring opinion, 367 U. S. 643, 661–666. This rule has caused the Court to refuse to accept evidence where there has been such an intrusion regardless of whether there has been a search or seizure in violation of the Fourth Amendment. As this Court said in *Lopez* v. *United States,* 373 U. S. 427, 438–439, "The Court has in the past sustained instances of 'electronic eavesdropping' against constitutional challenge, when devices have been used to enable government agents to overhear conversations which would have been beyond the reach of the human ear [citing

*Olmstead* and *Goldman*]. It has been insisted only that the electronic device not be planted by an unlawful physical invasion of a constitutionally protected area. *Silverman* v. *United States.*"

To support its new interpretation of the Fourth Amendment, which in effect amounts to a rewriting of the language, the Court's opinion concludes that "the underpinnings of *Olmstead* and *Goldman* have been . . . eroded by our subsequent decisions . . . ." But the only cases cited as accomplishing this "eroding" are *Silverman* v. *United States,* 365 U. S. 505, and *Warden* v. *Hayden,* 387 U. S. 294. Neither of these cases "eroded" *Olmstead* or *Goldman. Silverman* is an interesting choice since there the Court expressly refused to re-examine the rationale of *Olmstead* or *Goldman* although such a re-examination was strenuously urged upon the Court by the petitioners' counsel. Also it is significant that in *Silverman,* as the Court described it, "the eavesdropping was accomplished by means of an unauthorized physical penetration into the premises occupied by the petitioners," 365 U. S., at 509, thus calling into play the supervisory exclusionary rule of evidence. As I have pointed out above, where there is an unauthorized intrusion, this Court has rejected admission of evidence obtained regardless of whether there has been an unconstitutional search and seizure. The majority's decision here relies heavily on the statement in the opinion that the Court "need not pause to consider whether or not there was a technical trespass under the local property law relating to party walls." (At 511.) Yet this statement should not becloud the fact that time and again the opinion emphasizes that there has been an unauthorized intrusion: "For a fair reading of the record in this case shows that the eavesdropping was accomplished by means of an *unauthorized physical penetration* into the premises occupied by the petitioners." (At 509, emphasis added.) "Eavesdropping

accomplished by means of such a *physical intrusion* is beyond the pale of even those decisions . . . ." (At 509, emphasis added.) "Here . . . the officers overheard the petitioners' conversations only by *usurping* part of the petitioners' house or office . . . ." (At 511, emphasis added.) "[D]ecision here . . . is based upon the reality of an *actual intrusion* . . . ." (At 512, emphasis added.) "We find no occasion to re-examine *Goldman* here, but we decline to go beyond it, *by even a fraction of an inch.*" (At 512, emphasis added.) As if this were not enough, Justices Clark and Whittaker concurred with the following statement: "In view of the determination by the majority that the *unauthorized physical penetration* into petitioners' premises constituted sufficient trespass to remove this case from the coverage of earlier decisions, we feel obliged to join in the Court's opinion." (At 513, emphasis added.) As I made clear in my dissent in *Berger,* the Court in *Silverman* held the evidence should be excluded by virtue of the exclusionary rule and "I would not have agreed with the Court's opinion in *Silverman* . . . had I thought that the result depended on finding a violation of the Fourth Amendment . . . ." 388 U. S., at 79–80. In light of this and the fact that the Court expressly refused to re-examine *Olmstead* and *Goldman,* I cannot read *Silverman* as overturning the interpretation stated very plainly in *Olmstead* and followed in *Goldman* that eavesdropping is not covered by the Fourth Amendment.

The other "eroding" case cited in the Court's opinion is *Warden* v. *Hayden,* 387 U. S. 294. It appears that this case is cited for the proposition that the Fourth Amendment applies to "intangibles," such as conversation, and the following ambiguous statement is quoted from the opinion: "The premise that property interests control the right of the Government to search and seize has been discredited." 387 U. S., at 304. But far from being con-

cerned with eavesdropping, *Warden* v. *Hayden* upholds the seizure of *clothes,* certainly tangibles by any definition. The discussion of property interests was involved only with the common-law rule that the right to seize property depended upon proof of a superior property interest.

Thus, I think that although the Court attempts to convey the impression that for some reason today *Olmstead* and *Goldman* are no longer good law, it must face up to the fact that these cases have never been overruled or even "eroded." It is the Court's opinions in this case and *Berger* which for the first time since 1791, when the Fourth Amendment was adopted, have declared that eavesdropping is subject to Fourth Amendment restrictions and that conversations can be "seized."* I must align myself with all those judges who up to this year have never been able to impute such a meaning to the words of the Amendment.

---

*The first paragraph of my Brother HARLAN's concurring opinion is susceptible of the interpretation, although probably not intended, that this Court "has long held" eavesdropping to be a violation of the Fourth Amendment and therefore "presumptively unreasonable in the absence of a search warrant." There is no reference to any long line of cases, but simply a citation to *Silverman,* and several cases following it, to establish this historical proposition. In the first place, as I have indicated in this opinion, I do not read *Silverman* as holding any such thing; and in the second place, *Silverman* was decided in 1961. Thus, whatever it held, it cannot be said it "has [been] long held." I think my Brother HARLAN recognizes this later in his opinion when he admits that the Court must now overrule *Olmstead* and *Goldman.* In having to overrule these cases in order to establish the holding the Court adopts today, it becomes clear that the Court is promulgating new doctrine instead of merely following what it "has long held." This is emphasized by my Brother HARLAN's claim that it is "bad physics" to adhere to *Goldman.* Such an assertion simply illustrates the propensity of some members of the Court to rely on their limited understanding of modern scientific subjects in order to fit the Constitution to the times and give its language a meaning that it will not tolerate.

Since I see no way in which the words of the Fourth Amendment can be construed to apply to eavesdropping, that closes the matter for me. In interpreting the Bill of Rights, I willingly go as far as a liberal construction of the language takes me, but I simply cannot in good conscience give a meaning to words which they have never before been thought to have and which they certainly do not have in common ordinary usage. I will not distort the words of the Amendment in order to "keep the Constitution up to date" or "to bring it into harmony with the times." It was never meant that this Court have such power, which in effect would make us a continuously functioning constitutional convention.

With this decision the Court has completed, I hope, its rewriting of the Fourth Amendment, which started only recently when the Court began referring incessantly to the Fourth Amendment not so much as a law against *unreasonable* searches and seizures as one to protect an individual's privacy. By clever word juggling the Court finds it plausible to argue that language aimed specifically at searches and seizures of things that can be searched and seized may, to protect privacy, be applied to eavesdropped evidence of conversations that can neither be searched nor seized. Few things happen to an individual that do not affect his privacy in one way or another. Thus, by arbitrarily substituting the Court's language, designed to protect privacy, for the Constitution's language, designed to protect against unreasonable searches and seizures, the Court has made the Fourth Amendment its vehicle for holding all laws violative of the Constitution which offend the Court's broadest concept of privacy. As I said in *Griswold* v. *Connecticut,* 381 U. S. 479, "The Court talks about a constitutional 'right of privacy' as though there is some constitutional provision or provisions forbidding any law ever to be passed which might abridge the 'privacy'

of individuals. But there is not." (Dissenting opinion, at 508.) I made clear in that dissent my fear of the dangers involved when this Court uses the "broad, abstract and ambiguous concept" of "privacy" as a "comprehensive substitute for the Fourth Amendment's guarantee against 'unreasonable searches and seizures.' " (See generally dissenting opinion, at 507–527.)

The Fourth Amendment protects privacy only to the extent that it prohibits unreasonable searches and seizures of "persons, houses, papers, and effects." No general right is created by the Amendment so as to give this Court the unlimited power to hold unconstitutional everything which affects privacy. Certainly the Framers, well acquainted as they were with the excesses of governmental power, did not intend to grant this Court such omnipotent lawmaking authority as that. The history of governments proves that it is dangerous to freedom to repose such powers in courts.

For these reasons I respectfully dissent.