STATE of Indiana, Appellant–Plaintiff,

v.

**Robert J. SEIDL, Appellee–Defendant.**

**No. 19A01–1006–CR–309.**

Court of Appeals of Indiana.

Dec. 29, 2010.

Rehearing Denied April 6, 2011.

680 ▪ ▬▬▬▬▬▬▬▬▬▬▬▬▬

Gregory F. Zoeller, Attorney General of Indiana, Cynthia L. Ploughe, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellant.

Steven E. Ripstra, Ripstra Law Office, Jasper, IN, Attorney for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Pursuant to Indiana Code Section 35–38–4–2(5), the State appeals the trial court's order granting Robert J. Seidl's motion to suppress the State's evidence against him. The State raises a single issue for our review, namely, whether the trial court erred when it granted Seidl's motion to suppress. We reverse and remand for further proceedings.

### FACTS AND PROCEDURAL HISTORY

Sometime before November 14, 2009, Dubois County Deputy Sheriff John Thomas Anderson received an anonymous complaint of methamphetamine production at 8025 State Road 64, Seidl's residence. At about 5:30 p.m. on November 14, Deputy Anderson drove to that location, in uniform, and parked his patrol car about fifty yards east of the residence. Deputy Anderson exited his vehicle and ap-

proached the house, intending to engage Seidl in a "knock and talk." Transcript at 17. He did not notice any odors, but he did notice the vehicle of Jeff McGinnis in the driveway. The Dubois County Sheriff's Department had been investigating McGinnis "for methamphetamine." *Id.* Deputy Anderson proceeded "up the driveway." *Id.* at 6.

Seidl's residence is approximately 190 feet from S.R. 64. *See* State's Exh. 3. About 80 feet up the driveway, adjacent and contiguous to the driveway is an open gravel lot, which extends eastward for about 65 feet. The gravel lot leads from the driveway to a large pole barn. Deputy Anderson could not walk to Seidl's residence without first walking past the barn. The barn had an open, uncovered window facing Deputy Anderson on the driveway. From the driveway, Deputy Anderson could see through the window and saw the back of an unidentified man's head as he sat in a chair.

Deputy Anderson proceeded onto the gravel lot towards the barn. As he approached, he realized that the man he was looking at was McGinnis. McGinnis then noticed Deputy Anderson, and Deputy Anderson "saw him grab a piece of aluminum foil off the table that he was sitting at." *Id.* at 7. Deputy Anderson told McGinnis to cease and to place the object back on the table, which he did. Deputy Anderson asked McGinnis where Seidl was, and McGinnis said he was back at the residence. Without leaving his position near the barn window, Deputy Anderson used his cell phone to call Seidl and asked Seidl to come over to the barn and meet him, which Seidl promptly did.

Deputy Anderson explained to Seidl what he had witnessed and that it was his "belief they're smoking methamphetamine in your shed." *Id.* at 10. Deputy Anderson then talked to Seidl about con-

senting to a search, which included reading to Seidl a prepared consent form, presenting that form to Seidl for his review, and informing Seidl that he had the right to refuse consent. Deputy Anderson also told Seidl "about the potential for maintaining a common nuisance." *Id.* at 40. Seidl signed the consent form.

Shortly after Seidl consented to a search of the barn, another officer arrived and the two officers searched the barn. They discovered "various items of contraband, including marijuana, methamphetamine, and paraphernalia." Appellee's Br. at 3; *see* Appellant's App. at 4–5.

On December 2, the State charged Seidl with maintaining a common nuisance, a Class D felony; possession of methamphetamine, as a Class D felony; possession of marijuana, as a Class A misdemeanor; and possession of paraphernalia, as a Class A misdemeanor. On February 4, 2010, Seidl moved to suppress the entirety of the State's evidence against him under the federal and Indiana constitutions. The court held a hearing on Seidl's motion on June 3, after which the court stated as follows:

> the testimony of Officer Anderson here was that he suspected that there was manufacturing of methamphetamine going on [at] this property and that was the reason for his investigation. And the law basically, both the Fourth Amendment to the United States Constitution as well as Article I, Section 11 of the Indiana Constitution, both guarantee the right of a[n] individual to be secure against unreasonable search and seizure. [T]he case law however provides that . . . an investigation can be undertaken if an officer has specific and articulable facts that lead to a reasonable suspicion that criminal activity is occurring or is about to occur. And that reasonable suspicion . . . must be comprised as they said, or must be based

upon, specific and articulable facts. It can't be based upon hunches or suspicion or rumor [or] innuendo. [A]nd the officer has to point to those specific facts and give testimony with regard to those specific facts that would lead him to believe that there was criminal activity occurring. [E]ssentially, the question is whether a reasonable man in the ... shoes of the officer at that time would believe that there was reasonable grounds to suspect that a crime was occurring. And quite frankly I think there was insufficient evidence. [T]he State has indicated that there was a legitimate police purpose[,] but if there was one[ ] we haven't heard about it.... The officer also testified that there was no odor that was ... obvious to him as he approached the property or as he was on the property. Specifically, the officer has not testified to any evidence. And, again, there's been mention about he's associated with certain people and this and that, but ... I don't think you can find there's reasonable suspicion of criminal activity merely by the presence of certain individuals or certain individuals['] vehicles on this property. [T]he officer has [not] pointed to any specific ... facts that would lead a reasonable person to conclude that there might be manufacturing of methamphetamine on the property at that particular time. *Therefore, I don't think there was any reason for the officer to be present on the property. And I think that's the ... first hurdle that the State has to overcome* .... [C]ertainly here I don't think the evidence was sufficient to establish [reasonable suspicion]. For that reason, I'm going to grant the Defendant's Motion to Suppress. [A]ll evidence obtained after the officer's entry onto the property will be suppressed.

*Id.* at 66–68 (emphasis added). This appeal ensued.

## DISCUSSION AND DECISION

■ When reviewing a trial court's ruling on a motion to suppress evidence, we must determine whether substantial evidence of probative value supports the trial court's decision. *State v. Quirk,* 842 N.E.2d 334, 340 (Ind.2006). Where a trial court granted a motion to suppress, the State appeals from a negative judgment and must show that the trial court's grant of the motion was contrary to law. *State v. Carlson,* 762 N.E.2d 121, 125 (Ind.Ct. App.2002). We will reverse a negative judgment only when the evidence is without conflict and all reasonable inferences lead to a conclusion opposite that of the trial court. *Id.* We will not reweigh the evidence nor judge witnesses' credibility, and will consider only the evidence most favorable to the trial court's ruling. *State v. Friedel,* 714 N.E.2d 1231, 1235 (Ind.Ct. App.1999).

■ The Fourth Amendment to the Constitution of the United States protects citizens against unreasonable searches and seizures. The reasonableness of a search requires that the subject of the search has exhibited an actual subjective expectation of privacy that society as a whole is prepared to recognize as objectively "reasonable." *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). The mere fact that an area subjected to police observation is within the curtilage of a residence does not transform a warrantless observation or inspection into an unconstitutional search. *Trimble v. State,* 842 N.E.2d 798, 801 (Ind.2006), *aff'd on reh'g,* 848 N.E.2d 278 (Ind.2006). "As Katz explained, the Fourth Amendment protects people, not places." *Id.* at 802 (citing *Katz,* 389 U.S. at 351, 88 S.Ct. 507).

■ "[P]olice entry onto private property and their observations do not vio-

late the Fourth Amendment when the police have a legitimate investigatory purpose for being on the property and limit their entry to places visitors would be expected to go, such as walkways, driveways, and porches." *Id.* "The route which any visitor to a residence would use is not private in the Fourth Amendment sense, and thus if police take that route for the purpose of making a general inquiry or for some other legitimate reason, they are free to keep their eyes open." *Id.* (citation and quotation omitted). And while an anonymous tip is not a basis for either reasonable suspicion or probable cause, "it is sufficient to make inquiries which the occupants are free to decline to answer if they so choose." *Hardister v. State,* 849 N.E.2d 563, 570 (Ind.2006).

■ Which areas of a given piece of real estate may reasonably be viewed as open to visitors is fact-specific. *Trimble,* 842 N.E.2d at 802. The determination will "necessarily include consideration of the features of the property itself, such as the existence of walkways and fences or other obstructions to access or viewing, the location of primary residential entryways, as well as the nature or purpose for the visitor's call." *Id.* (citation omitted).

■ As this court has recognized:

The prevailing rule is that, absent a clear expression by the owner to the contrary, police officers, in the course of their official business, are permitted to approach one's dwelling and seek permission to question an occupant. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude a "seizure" has oc-

curred. A seizure does not occur simply because a police officer approaches a person, asks questions, or requests identification.

*Redden v. State,* 850 N.E.2d 451, 458 (Ind. Ct.App.2006) (citations and quotations omitted), *trans. denied.* For a " 'knock and talk' procedure[, t]he constitutional analysis begins with the knock on the door." [1] *Hayes v. State,* 794 N.E.2d 492, 496 (Ind.Ct.App.2003), *trans. denied.*

■ The core of the trial court's rationale for granting Seidl's motion to suppress was its conclusion that the Fourth Amendment applied to the officer's actions the moment the officer stepped foot on Seidl's property, and that, to constitutionally advance onto Seidl's driveway, the officer first needed at least a reasonable suspicion for doing so. That conclusion is contrary to law. *See Hardister,* 849 N.E.2d at 570; *Trimble,* 842 N.E.2d at 801–02. Seidl's driveway was the normal route for ingress to and egress from the residence, and Deputy Anderson used that route "for the purpose of making a general inquiry." *Trimble,* 842 N.E.2d at 801–02. As Seidl himself concedes, a "legitimate reason[ ] for police to investigate [is] a complaint or a tip." Appellant's Br. at 7. Further, there are no facts in the record from which one could reasonably conclude that Seidl intended to keep his driveway private. *See Trimble,* 842 N.E.2d at 802. Accordingly, the trial court clearly erred when it concluded that a constitutional analysis began not when Seidl personally became involved but at Seidl's property line. *See Hayes,* 794 N.E.2d at 496.

---

**1.** "A knock and talk investigation 'involves officers knocking on the door of a house, identifying themselves as officers, asking to talk to the occupant about a criminal complaint, and eventually requesting permission to search the house.' " *Hayes v. State,* 794 N.E.2d 492, 495 (Ind.Ct.App.2003) (quoting *State v. Reinier,* 628 N.W.2d 460, 466 (Iowa 2001)), *trans. denied.*

■ Less than halfway up Seidl's driveway, Deputy Anderson saw an unidentified man in the barn. Of course, the officer was "free to keep [his] eyes open" while he walked toward Seidl's residence. *See Trimble*, 842 N.E.2d at 801. The barn was on a gravel lot that was adjacent and contiguous to the driveway. As with the driveway itself, there are no facts in the record from which one could conclude that Seidl intended to keep the gravel lot or the view into the window of the pole barn segregated from the public entering the premises. Thus, Deputy Anderson committed no constitutional error by diverting himself from the residence to the barn to more closely observe what was already in plain sight.

■ Once the officer recognized McGinnis and ordered him to replace the piece of foil McGinnis initially attempted to conceal, the officer called Seidl on the phone and asked Seidl to meet him by the barn. That simple request is not a constitutional violation. And once Seidl met Deputy Anderson, Deputy Anderson informed Seidl of what he had witnessed McGinnis doing. He then asked Seidl for consent to search the barn, reading to Seidl a lengthy rights form, allowing Seidl to read that form for himself, and explaining to Seidl that he had the right to refuse consent. Nonetheless, Seidl consented to a search of the barn. Consent is a well-recognized ground for a constitutional search. *E.g., Meyers v. State*, 790 N.E.2d 169, 171–72 (Ind.Ct.App.2003). Accordingly, the evidence seized pursuant to that search was not seized in violation of the Fourth Amendment.

Much of Seidl's arguments on appeal in favor of the trial court's judgment center on the officer's purported failure to complete the knock and talk: "there was talk, but no knock." Appellant's Br. at 5–6. Seidl also challenges the officer's purported lack of reasonable suspicion from the outset of his appearance at the property. But those arguments ignore the fact that Deputy Anderson was permitted to enter onto the property in the same manner as the public for purposes of general inquiry, and that, once on the property, he was not obliged to ignore what was in plain view.

■ Seidl also suggests that, when he met Deputy Anderson near the barn, he "was not free to leave." *Id.* at 6. As such, he continues, his consent to the search was not voluntary but, rather, "merely a submission to the supremacy of the law." *Id.* at 10 (quotation omitted). The voluntariness of a defendant's consent to search is determined by the totality of the circumstances. *Meyers*, 790 N.E.2d at 172. But "[a] consent to search is valid unless it is procured by fraud, duress, fear, or intimidation, or where it is merely a submission to the supremacy of the law." *Id.* Seidl's bald assertions aside, there are no facts supporting of his conclusion that his consent to the search of the barn was involuntary.

Finally, Seidl contends that his right under Article I, Section 11 of the Indiana Constitution was also violated. For the reasons stated above, we cannot agree. *See, e.g., Sowers v. State*, 724 N.E.2d 588, 591–92 (Ind.2000) (holding that the defendant's claims under Article I, Section 11 of the Indiana Constitution failed "[f]or the same reasons" the defendant's claims under the Fourth Amendment failed).

In sum, the trial court's order granting Seidl's motion to suppress is contrary to law. As such, we reverse and remand for further proceedings.

Reversed and remanded.

DARDEN, J., and BAILEY, J., concur.