HUMPHREYS, J.,
concurring.
I join entirely in the analysis and judgment of the majority that we need not address the merits of the Fourth Amendment implications of the use of GPS tracking devices by law enforcement officers because, for the reasons noted by the majority, the exclusionary rule does not operate to suppress the eyewitness testimony of the police officers in this case. I write separately only to address some of the points raised by Judge Beales in Section II of his concurring opinion.
The fundamental purpose of the Fourth Amendment “is to safeguard the privacy and security of individuals against arbitrary invasions by government officials.” Camara v. Mun. Court of San Francisco, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967); see also Skinner v. Ry. Labor Execs. Ass’n, 489 U.S. 602, 613-14, 109 S.Ct. 1402, 1410-12, 103 L.Ed.2d 639 (1989) (“The [Fourth] Amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government or those *133 acting at their direction.” (citing Camara, 387 U.S. at 528, 87 S.Ct. at 1730)). Since 1967, the Fourth Amendment has been understood to be fundamentally concerned with protecting an individual’s “privacy” from invasion and interference by the government and its agents. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). With the advent of the telephone—and the subsequent ability to tap it from the premises of a third party, the phone company—the Supreme Court recognized that the old property-centric reading of the Fourth Amendment that married the concepts of “search and seizure” to physical trespass was no longer tenable. Id. at 351-53, 88 S.Ct. at 511-12. Twentieth century technology had made it easy for government to intrude upon people’s personal lives without intruding on their property. Consequently, the Supreme Court changed course in Katz, and determined that the Fourth Amendment “protects people, not places,” id. at 351, 88 S.Ct. at 511, and substituted “reasonable expectations of privacy’ for property rights as the defining element of a government “search,” id. at 360-61, 88 S.Ct. at 516-17 (Harlan, J., concurring). Thus, under the current understanding of the Fourth Amendment, the Constitution is concerned only with government actions that violate a “reasonable expectation of privacy,” which courts have held is limited to the exposure of what was previously secret and not exposed in public. See, e.g., Carter v. Commonwealth, 209 Va. 317, 320, 163 S.E.2d 589, 592 (1968) (“A search implies a prying into hidden places.”).
Advances in technology in the twenty-first century have engendered a growing number of previously unavailable investigative and surveillance techniques—such as the GPS location tracking illustrated by this case—that allow the government to conduct what many intuitively find to be an increasingly troubling degree of monitoring of its citizens, potentially on a vast scale, by targeting information that is at least, in some sense, “public.” As was the case in United States v. Maynard, 615 F.3d 544, 555 (D.C.Cir.2010), we are not talking about the “public” events of a single evening, but rather the comprehensive observation or electronic tracking that takes *134 place over a period of days, weeks, or months. While it is reasonable to expect that anyone might witness any one of such a series of public activities or events, it does not follow that one cannot reasonably expect that a particular person or group would not be privy to all of them. Similarly, one might reasonably expect something as intensely personal as their genetic profile to remain private even if such a profile could in principle be extrapolated from residual DNA left upon a glass or fork “abandoned” in a public restaurant. Thus, Maynard can be read to suggest that private (and thus protected) facts may be extrapolated from the aggregation of individual public events or from a technologically assisted analysis of “public” objects or information. 615 F.3d at 565-66. Kyllo v. United States, 533 U.S. 27, 33, 121 S.Ct. 2038, 2042, 150 L.Ed.2d 94 (2001), also supports the latter point.
However, although “privacy” is the centerpiece of current Fourth Amendment jurisprudence, the word “privacy” does not actually appear in the text of the Fourth Amendment. The constitutional protection actually promised is “security,” and the time may be ripe for the courts to reconsider that term as it was used and understood by the framers of the amendment in the context of our current “Information Age” where privacy is becoming an increasingly scarce commodity. While “privacy” and “security” are overlapping concepts, they are not congruent. Granting that we as a people feel freer and more secure when our government and its agents respect our privacy, the limits of government intrusion that reasonable citizens find unacceptable are not necessarily circumscribed only by what they choose to keep private.
Perhaps the time has come that courts recognize that by its own terms, the Fourth Amendment actually stipulates that “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated----” U.S. Const, amend. TV (emphasis added). Courts tend to abridge this phrase essentially to “the right against unreasonable searches and seizures shall not be violated.” Thus, the words “people” and “secure” get lost in the editing. Nevertheless, the framers presumably *135 chose those words with some care and deliberation. With regard to their use of the word “people,” they were certainly capable of speaking in the singular. For example, in the Fifth Amendment they provide, “No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, ... nor shall any person be subject for the same offense to be twice put in jeopardy____” U.S. Const, amend. V (emphasis added). This indicates to me that their choice of the plural in the Fourth Amendment was deliberate. In other words, the protection afforded by the Fourth Amendment is not just concerned with how government searches and seizures affect the interests of particular individuals, but it is also concerned with those that affect the public generally. Moreover, the overall purpose of the Bill of Rights was to restrain the arbitrary and capricious use of government power. Thus, given the Fourth Amendment’s ratification in the aftermath of a revolution largely precipitated by such abuse of governmental power, it seems obvious to me that “security” was actually a significant legal concept in the minds of the framers—something free people enjoyed in contrast to the insecurity generated by the arbitrary exercise of government authority as experienced by the framers and their fellow colonists prior to our independence as a nation.
If we consider the increasingly ubiquitous presence of public video surveillance camera networks, the use of electronic scanners that perform a virtual “strip search” of those-who make use of some forms of public transportation along with the increasing use of GPS tracking devices, whatever intuitive unease we feel about the methods employed by agents of the government has less to do with a sense that the individual “right to privacy” of any particular person has been violated than with concerns about our sense of security from governmental monitoring of the citizenry as a whole.
Although the Supreme Court of the United States will ultimately have the last word, “the Fourth Amendment must keep pace with the inexorable march of technological progress, or its guarantees will wither and perish.” United States v. *136 Warshak, 631 F.3d 266, 285 (6th Cir.2010). Therefore, as the courts consider how to construe the confluence of revolutionary advances in technology with the fundamental principles embodied in the Fourth Amendment, it may be time, in cases where these issues may be more appropriately addressed than this one, for the courts to do so with the express language and the original purpose of the Fourth Amendment in mind.[18] Perhaps in addition to determining whether an individual’s reasonable expectation of privacy has been violated, we might also consider whether reasonable people would remain secure in their liberties if a particular investigative or surveillance method were pervasive. If they would not, the courts should determine what restrictions—such as requiring reasonable articulable suspicion of criminal activity or a judicially authorized warrant based upon probable cause—would sufficiently narrow the method’s application in a way that leaves all reasonable citizens with a realistic sense of security from arbitrary and invasive governmental monitoring of their daily activities.

. Contrary to Judge Beales's assertion, I do not "suggest that the United States Supreme Court should overturn (or significantly alter) decades of Fourth Amendment precedent from that Court.” I merely observe that as our culture continues to rapidly evolve based upon technological advances, Fourth Amendment jurisprudence must likewise continue to evolve, as it has done since the founding of the Republic, to accommodate such changes. I only suggest that as the courts participate in this evolution, as we must, we should do so with the original purpose of the Fourth Amendment in mind.