**Robert E. SHAFFER, Petitioner,**

v.

**Harold V. FIELD, Superintendent, Respondent.**

**No. 71–2345.**

United States District Court, C. D. California.

Jan. 20, 1972.

Burton Marks of Marks, Sherman & Schwartz, Beverly Hills, Cal., for petitioner.

Evelle J. Younger, Atty. Gen., Rodney Lilyquist, Jr., Deputy Atty. Gen., Los Angeles, Cal., for respondent.

## ORDER DENYING WRIT OF HABEAS CORPUS

DAVID W. WILLIAMS, District Judge.

Petitioner, a former deputy sheriff of Los Angeles County, was convicted by a jury in the Superior Court of that county for a violation of Penal Code § 187, murder in the second degree. The judgment was affirmed by the California Court of Appeal, Second Appellate Division, in an unpublished opinion. (Crim.No.18674, June 22, 1971). A petition for hearing was denied by the State Supreme Court and petitioner, now confined in prison, files this petition for a writ of habeas corpus. This Court has jurisdiction under 28 U.S.C. § 2254. An evidentiary hearing was ordered by this Court but the parties waived said hearing by a filed document.

The facts of the case were fully set forth in the unpublished opinion of the Court of Appeal. For purposes of this petition they may be briefly restated. On August 18, 1969, at about 4:30 A.M. petitioner and his partner, Deputy Malone, together with another two-man patrol unit consisting of Deputies Manskar and Spreen, responded to a "burglary in progress" call in a business establishment. All except Deputy Malone entered the premises and noticed that articles had been strewn about indicating that someone had partially ransacked the premises. The three officers inside heard a noise at the rear and moved toward the back room. Petitioner and Deputy Manskar entered a storage garage which was very dark and in the center of which was a pool table. Shaffer entered first and moved along the left side of the pool table. They had been looking around when suddenly the petitioner raised his left hand toward some boards stacked in a corner, stepped back, raised his right hand and then fired one shot. Robert Molett, the burglary suspect, had been crouched behind the stacked boards and was hit by the shot Shaffer fired. Momentarily thereafter, Deputy Manskar walked over to the corner of the pool table and asked petitioner "what happened?" and "where is the gun?" or "is there a gun?" Petitioner said "Yes, right there" and pointed to the floor where a .22 caliber revolver lay next to Molett's leg. As this happened, Molett said "that's not my gun; he [defendant] threw it down there".

Deputy Malone entered the building and was told by the petitioner that the suspect tried to shoot him and that he shot first. At Shaffer's request Malone got a camera for him from the patrol car and then returned to the scene where he saw the suspect thrashing about the floor in great pain and bleeding profusely from the left side. Malone asked the suspect why he tried to shoot Deputy Shaffer and Molett replied, "I didn't try to shoot your partner. Your partner shot me and threw down the gun." Malone confronted petitioner with this statement but Shaffer did not reply. Then Malone noticed an empty cellophane bag protruding from petitioner's right rear pocket and remembered that on several occasions in the past he had seen petitioner place a cellophane bag which appeared to contain a revolver in his locker. He then saw a .22 caliber revolver being passed around by various deputies. He asked petitioner whether the suspect's fingerprints were on the gun and defendant replied, "Hell no; what do you think I am passing it around for?"

Sergeant Wenke then arrived and petitioner told him that immediately preceding the shooting he heard a "click" which he could not locate and then heard a second "click" and saw a gun protruding from behind some stacked boards. Wenke asked Molett if he tried to shoot his deputies and Molett replied, "No, man, no." Wenke then asked Molett if he used the .22 caliber revolver and Molett said, "No, man, I didn't have a gun . . . . " Molett died four hours later.

At all times relevant there existed a sheriff's department regulation forbidding a deputy to carry or use a second service revolver or to substitute a revolver in lieu of the prescribed firearm. On November 12, 1969, pursuant to a homicide investigation, petitioner's sheriff's locker at the Firestone Sheriff Station was examined and officers found and seized a .357 Magnum and a 6.35 millimeter automatic revolver. Petitioner was charged with the murder of Molett.

At the trial the spontaneous statements of the deceased were introduced into evidence against Shaffer. On March 31, 1969, at 11:25 A.M. the jury began its deliberation. On April 3, 1969 at 10:40 A.M. the trial judge received the following note from the foreman of the jury: "Our last ballot, 10:15 A.M. ten to two, I feel we are hopelessly deadlocked. Two jurors that are connected family-wise with law enforcement will never change their vote." The judge

then read to the jury the statement set out in the appendix appended hereto.

In this petition Deputy Shaffer contends that the trial court violated his constitutional rights in the following manner:

1) That the admission into evidence of the spontaneous statements of the dying victim violates petitioner's Sixth Amendment right of confrontation.

2) That the warrantless unconsented to search of petitioner's locker at the sheriff substation violates his Fourth Amendment right to be free from unreasonable searches and seizures.

3) That the giving of the so-called Baumgartner instruction to the deadlocked jury deprived petitioner of due process of law and the right to trial by jury.

4) That the failure of the trial judge to give an instruction as to the lesser included offense of manslaughter deprived petitioner of due process of law.

Each contention will be discussed separately.

## SPONTANEOUS STATEMENTS

On four separate occasions following the shooting, the suspect stated to four different police officers that he did not have a gun and that he was shot by the petitioner who then threw down a gun beside him. The statement to Deputies Manskar and Malone were made immediately following the shooting and the statements to Sergeants Wenke and Hansell were made shortly thereafter and in response to questions. The evidence shows that all during this period the suspect was in great pain, bleeding profusely and was thrashing about on the floor deeply concerned with his own physical condition. He died within four hours of the shooting. The physical condition of the suspect, the agitation he felt from the pain of the bullet in his abdomen which lacerated his spinal cord and injured his back, and the profuse bleeding are all circumstances which suggest that Molett was not concerned with fabricating a contrived story before his death and that the statements were the product of nervous excitement.

Section 1240 of the California Evidence Code makes admissible as an exception to the hearsay rule spontaneous statements. The Law Revision Commission's comment to Section 1240 explains that "The rationale of this exception is that the spontaneity of such statements and the consequent lack of opportunity for reflection and deliberate fabrication provide an adequate guarantee of their trustworthiness." Clearly the presumption is that statements made closely after the occurrence of an incident are likely to be trustworthy. The comment of the Law Revision Commission to Section 1240 indicates that it was intended as a codification of the "res gestae" exception to the hearsay rule as announced in Showalter v. Western Pacific R. R. Co., 16 Cal.2d 460, 106 P.2d 895 (1940), which Court explained the rule to be "that declarations which are voluntary and spontaneous and made so near the time of the principal act as to preclude the idea of deliberate design, though not precisely concurrent in point of time therewith, are regarded as contemporaneous and admissible." The *Showalter* court expanded the rule to say that "where a declaration is made under the immediate influence of the occurrence to which it relates and so near the time of that occurrence as to negative any probability of fabrication, said declaration is admissible." This rule has been followed in the recent case of People v. Spencer, 71 Cal.2d 933, 940, 80 Cal.Rptr. 99, 458 P.2d 43 (1969).

The trustworthiness of the statements made by Molett under the test announced in *Showalter* and *Spencer* has been clearly established. The two statements to Manskar and Malone were made within moments of the shooting. The fact that Malone asked Molett why he tried to shoot his partner does not deprive Molett's answer of its spontaneity. People v. Washington, 71 Cal.2d 1170, 81 Cal.Rptr. 5, 459 P.2d 259 (1969). The statements made shortly

thereafter to Wenke and Hansell are also trustworthy under the *Spencer* test. The lapse of time must be viewed in the light of the continuing excitement and agitation that Molett underwent and the later statements seemed to add no new accusations. The record is clear that at the time he told Wenke and Hansell his story Molett was still under extreme pain, was screaming and swearing and thrashing around on the floor. This indicates that his condition rapidly deteriorated after he had been shot. It is unlikely, under these circumstances, that he would have contrived or fabricated a story. To the contrary it appears that the statements to Wenke and Hansell were made while under the "influence of the occurrence" to which the statements relate. People v. Spencer, *supra*, People v. Washington, *supra*.

Petitioner argues that the State's determination that the evidence is trustworthy is nonetheless subject to the confrontation clause of the Sixth Amendment. He relies on Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) and California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). That reliance is misplaced. *Pointer* specifically states that the confrontation clause does not preclude the admissibility of hearsay evidence and cites Mattox v. United States, 146 U.S. 140, 151, 13 S.Ct. 50, 36 L.Ed. 917 (1892), which holds admissible dying declarations as an exception to the hearsay rule. In California v. Green the Court held that prior inconsistent statements of a witness were admissible for substantive use as well as for impeachment. The Court discussed in dicta the admissibility of hearsay evidence where there is indicia of its reliability or trustworthiness.

Recently in Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) the Supreme Court held that the confrontation clause did not preclude a State from admitting against a co-conspirator, as an exception to the hearsay rule, the statement of a conspirator made after arrest but in furtherance of keeping secret the conspiracy. The Court agreed in *Dutton* that hearsay was not precluded by the confrontation clause, but could not agree on a specific set of reasons. Four members of the Court thought that the hearsay evidence did not violate the confrontation clause because there were indicia of its reliability, there was other strong evidence of guilt and defendant had the opportunity to fully cross examine all available witnesses for the prosecution. Two members of the Court thought that in addition to the above stated reasons, the admission of the hearsay evidence was mere harmless error, if error at all. Justice Harlan maintained that the admissibility of hearsay evidence should not be examined in light of the confrontation clause but the due process clause of the Fourteenth Amendment. To Justice Harlan the evil that the evidence might do must be weighed against the likelihood that its admission would increase the just determination of truth. Under the facts of this case, neither the confrontation nor due process clause can be said to have been violated. The evidence was highly relevant and helpful to a just determination of truth, it had other indicia of reliability which aided the trial judge to determine that it was trustworthy evidence, there were witnesses to the shooting which corroborated the hearsay statements and petitioner had full opportunity to cross examine all the prosecutions witnesses. I therefore conclude that the admission of the spontaneous statements of Molett into evidence as an exception to the hearsay rule prescribed by Section 1240 of the California Evidence Code violates neither the confrontation clause of the Sixth Amendment nor the due process clause of the Fourteenth and Fifth Amendments.

## SEARCH OF LOCKER

Petitioner contends that the search of his locker at the substation after the shooting was an unreasonable and unconsented to search. In support of his

argument he relies on Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L. Ed.2d 576 (1967) and United States v. Blok, 88 U.S.App.D.C. 326, 188 F.2d 1019 (1951). Petitioner further argues that deputy sheriffs are not entitled to "watered-down" versions of their constitutional rights and that there had to be consent by petitioner before the search could be lawfully conducted.

■ It is recognized that public servants such as petitioner are not subject to "watered-down" versions of their constitutional rights. See Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L. Ed.2d 562 (1967). The reasonableness of any search, however, must rest on the circumstances surrounding it. In *Katz* the Supreme Court discarded its former ruling that electronic eavesdropping was permissible as long as there was no actual physical penetration or technical trespass of the premises or area where the "suspect" conversation was being overheard, and held that electronic eavesdropping even without physical penetration constituted an illegal search under the Fourth Amendment. In so holding the Court said "wherever a man may be, he is entitled to know that he will remain free from unreasonable searches and seizures" *Katz*, 389 U.S. at page 359, 88 S.Ct. at page 515. This decision clearly changed the nature of the Fourth Amendment right from possessory to personal.

Even though the right is personal and does not depend on whether one is in his home, it does not follow that the right may be asserted absolutely to prevent one's statements either oral or written from being used against him. In United States v. White, 401 U.S. 745, 752, 91 S. Ct. 1122, 28 L.Ed.2d 453 (1971) the Court said, "Our problem, in terms of the principles announced in *Katz*, is what expectations of privacy are constitutionally 'justifiable'—what expectations the Fourth Amendment will protect in the absence of a warrant." The Court went on to hold that electronic eavesdropping by planting a bug on an informant who conversed with the de-

fendant was permissible, because, in fact, there is little difference between an informer relating to the police what happened by using his words and by allowing the police to hear the actual conversation. When statements are communicated to another, it is no longer an unreasonable search if police learn of these conversations and make arrests based upon them.

■ Thus the fact that the Fourth Amendment right is personal is not talismanic. What must be determined is whether petitioner's expectation of privacy is constitutionally "justifiable". United States v. Blok, *supra*, decided before *White*, held that a government clerk, suspected of committing a misdemeanor which was not connected with her employment, could object on Fourth Amendment grounds to an unconsented police search of her desk which revealed incrimination evidence. *Blok*, however, must be limited to its facts. The Court suggested that if the defendant had been charged with a misdemeanor arising out of misconduct in connection with her employment, her superiors would have been justified in authorizing a search of the desk assigned her. In dicta the Court also said that the defendant's right to keep personal belongings in her desk, free from unreasonable searches by superiors and police officers could be defeated by a valid regulation to the contrary. The defendant in *Blok* had constitutionally justifiable expectations of privacy because the misconduct alleged did not arise out of her employment and there was no regulation or practice putting her on notice that her desk would be subject to inspection by superiors.

In several subsequent cases including United States v. Donato, 269 F.Supp. 921, Aff'd, 379 F.2d 288 (3rd Cir. 1967), searches of the lockers of government employees by security guards have been held to be constitutionally permissible. In each instance the locker was assigned to the exclusive use of the defendant and in each instance there was a governmental regulation which held that

no locker shall be considered private. In *Donato* the Court seem impressed with the fact that the regulation was reasonably necessary to maintain a sanitary and fit operation at the United States Mint.

■ *Donato* and *Blok* are instructive. The Supreme Court's mandate in *White* to determine whether the expectations of privacy are constitutionally justifiable must be considered in the light of the following criteria:

(1) the nature of the charge against petitioner, and

(2) the object of the search, and

(3) whether there exists any regulation or practice which should have put petitioner on reasonable notice that his locker could be examined by others without his consent.

Petitioner was suspected of committing a homicide. Because he was a deputy sheriff in whom great responsibility for the safeguarding and protection of human life is placed, the charge is grave. The alleged murder occurred in the course of petitioner's duty as a deputy sheriff while petitioner was acting within the scope of the authority vested in him by the State of California. The charge relates to official misconduct or conduct facilitated by petitioner's official position as a deputy sheriff. The locker search was conducted at the Firestone station and had as its object the determination whether petitioner had in his possession any service revolvers which were unauthorized. The earlier investigation reasonably pointed to a suspicion that petitioner possessed a "throw away gun". Known to petitioner's superiors was the fact that some officers were suspected of concealing extra guns on their persons while on patrol so that if they became involved in a shooting incident which might provoke an investigation if the victim turned out to be unarmed, the officer could surreptitiously place a "throw away gun" near the victim and claim that the victim was armed. The Sheriff's Department has a substantial interest in assuring not only the appearance but the actuality of police integrity. It is not unreasonable that they have the right of inspection as followed in this case so that the public may have confidence in public servants.

■ At a pretrial motion in the Superior Court made by petitioner under § 1538.5 of the California Penal Code to suppress the seized revolvers, the commander of Firestone Station testified that the lockers assigned to deputy sheriffs are owned by the department, that the locks given the deputies had both keys and combinations but that the commander kept a master key and the combination to all locks, that the lockers and locks could be changed at will and that on at least three occasions in the past deputies' lockers had been searched by commanders without the deputies' permission. On cross examination he testified that it was not necessary to get a deputy's consent to search the locker assigned him. The trial judge was of the opinion that the search did not violate the Fourth Amendment and denied the motion to suppress. The evidence used by the trial judge in reaching this opinion indicates that petitioner did not have a constitutionally justifiable expectation of privacy in the locker. I reach the conclusion that the locker search did not violate petitioner's Fourth Amendment rights.

### COERCIVE JURY INSTRUCTION

Petitioner contends that the note sent to the trial judge by the jury foreman during deliberation indicating that the jury was deadlocked "made crystal clear the situation that unless the judge proceeded to compel a verdict the case might have to be retried." Petitioner claims that the so-called *Baumgartner* instruction read to the jury after the receipt of the note effectively coerced the jury into a verdict. The giving of this instruction was condemned in People v. Baumgartner, 166 Cal.App.2d 103, 332 P.2d 366 (1958) because in that case the judge knew numerically how the jurors

stood on guilt or innocence. The same instruction was approved in the later case of People v. Barnes, 210 Cal.App.2d 740, 26 Cal.Rptr. 793 (1962) where it was given by a trial judge who knew numerically how the jury stood but did not know whether the majority was for guilt or acquittal. In the case at bar petitioner argues that the note stating that two jurors who are connected family-wise with law enforcement refuse to change their vote could only mean that they were holding out for acquittal. The trial judge did not understand the note to mean that because before reading the instruction the judge said "the Court cannot determine on its own, precisely what that statement means or what it indicates". The note from the foreman could have meant that the two jurors who would not change their minds were for either conviction or acquittal. This was expressed in the unpublished opinion of the Court of Appeal when it stated "it is just as reasonable to assume that one connected family-wise with law enforcement was offended by defendant's conduct and its resultant adverse effect on thousands of good law enforcement officers who are conscientiously going about their duties of protecting the public and enforcing the law as it is to assume that he subscribes to the theory that law enforcement officers can do no wrong" at page 14.

The *Baumgartner* instruction was given at 10:40 A.M. on the 4th day of jury deliberation and the jurors deliberated several hours afterwards before finally returning their verdict. In United States v. Moore, 429 F.2d 1305 (9th Cir., 1970) the Court of Appeals ruled on the coercive effect of the Allen instruction,[1] which was actually identical to the *Baumgartner* instruction. The Court was impressed with the fact that the jury did not reach a verdict immediately after receiving the instruction but continued to deliberate several additional hours. In the instant case the

jury had deliberated over the course of several days during which time they undoubtedly thrashed out the issues among themselves. Their minds were not pressured by the *Baumgartner* instruction. To the contrary they continued serveral hours of deliberation before arriving at a verdict. Under these circumstances I cannot conclude that the verdict was coerced or that petitioner was deprived of due process.

### LESSER INCLUDED OFFENSE

California law requires the trial court in a criminal proceeding to give an unrequested instruction *sua sponte* on general principles of law relevant to issues raised by the evidence. People v. Hood, 1 Cal.3rd 444, 82 Cal. Rptr. 618, 462 P.2d 870 (1969). The absence of such an instruction, however, does not raise a constitutional question if there was no due process violation. People v. Hocker, 423 F.2d 960 (9th Cir., 1970). A due process violation can occur only if the evidence is reasonably susceptible of an interpretation other than murder or innocence. People v. Mitchell, 61 Cal.2d 353, 363, 409 P.2d 211, cert. denied, 384 U.S. 1007, 86 S.Ct. 1985, 16 L.Ed.2d 1021 (1966).

In support of his contention that an instruction as to a lesser included offense should have been given by the court *sua sponte*, petitioner advances at least two "plausible" theories. Petitioner could have acted negligently in shooting Molett or the jury could have believed that Molett did not have a gun while also believing that petitioner thought he saw the suspect with a gun in his hand. The Court of Appeal considered these same contentions at length and concluded that such alternative theories could be arrived at only through a process of tortured deduction. The evidence adduced at the trial showed either that there were "clicks" which sounded like a revolver being cocked and that pe-

---

1. Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). The "Allen charge" was recently approved in

Orthopedic Equipment Co. v. Eutsler, 276 F.2d 455 (4th Cir., 1960).

titioner saw the suspect with a gun in his hand about to fire, or that there were no "clicks" and that petitioner shot Molett and threw a .22 caliber revolver at his feet claiming that it belonged to the victim. This evidence does not support petitioner's contention that an instruction as to the lesser included offense should have been given. I cannot conclude that the findings of either the trial judge or the Court of Appeal deprived petitioner of due process of law. See Vizzard v. Procunier, 439 F.2d 94 (9th Cir., 1971).

The petition is denied.

## APPENDIX

"In a large propotion [sic] of cases, and perhaps, strictly speaking, in all cases, absolute certainty cannot be attained or expected. Although the verdict to which a juror agrees must of course be his own verdict, the result of his own convictions, and not a mere acquiescence in the conclusion of his or her fellows, yet, in order to bring twelve minds to a unanimous result, you must examine the questions submitted to you with candor, and with a proper regard and deference to the opinions of each other. You should consider that the case must at some time be decided; that you are selected in the same manner, and from the same source from which any future jury must be; and there is no reason to suppose that the case will ever be submitted to twelve men and women more intelligent, more impartial or more competent to decide it, or that more or clearer evidence will be produced on the one side or the other. And with this view it is your duty to decide the case, if you can conscientiously do so. In order to make a decision more practicable, the law imposes the burden of proof on one party or the other, in all cases. In the present case, the burden of proof is upon the People of the State of California to establish every part of it beyond a reasonable doubt; and if, in any part of it, you are left in doubt, the defendant is entitled to the benefit of the doubt, and

must be acquitted. But, in conferring together, you ought to pay proper respect to each other's opinions, and listen, with a disposition to be convinced, to each other's arguments. And, on the one hand, if much the larger number of your panel are for a conviction, a dissenting juror should consider whether a doubt in his or her own mind is a reasonable one, which makes no impression upon the minds of so many men or women, equally honest, equally intelligent with himself or herself, and who have heard the same evidence with the same attention with an equal desire to arrive at the truth, and under the sanction of the same oath. And, on the other hand, if a majority are for acquittal, the minority ought seriously to ask themselves whether they may not reasonably, and ought not to doubt the correctness of a judgment, which is not concurred in by most of those with whom they are associated; and distrust the weight or sufficiency of that evidence which fails to carry conviction to the minds of their fellows."