141 N.J. Super. 67 (1976)
357 A.2d 286
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
MARIO FERRARI, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued December 16, 1975.
Decided April 21, 1976.
*68 Before Judges KOLOVSKY, BISCHOFF and BOTTER.
Mr. Archibald Kreiger, Assistant Prosecutor, argued the cause for appellant (Mr. Thomas J. Shusted, Camden County Prosecutor, attorney).
Mr. Saverio R. Principato argued the cause for respondent.
PER CURIAM.
With leave granted, the State has taken this interlocutory appeal (R. 2:3-1; R. 2:5-6(a)) from an order suppressing unprocessed traffic tickets found in a warrantless search of the locked desk of defendant, the Deputy Chief of Police of the City of Camden. The desk was in defendant's office at police headquarters. The traffic tickets had been issued some months before to another police officer in the department and, after the seizure, that officer and defendant were both indicted for (a) conspiracy "to fix" traffic tickets, (b) obstructing justice and (c) misconduct in office.
The testimony in this case makes it difficult to discern the reason for entering defendant's office at one o'clock in the morning, breaking open his locked desk and searching through his papers until incriminating evidence was found. Police Chief Harold Melleby testified at the hearing on the motion to suppress that the traffic tickets were found on top of the desk (a "plain view" claim) and that the desk was not broken open. This evidence was contradicted by the City Attorney, Martin F. McKernan, Jr., who was called as a witness by the trial judge. McKernan's persuasive and credible testimony was accepted by the trial judge. Appellant does not now dispute that the tickets were found after the *69 desk had been broken open. However, appellant contends that the search was justified as an administrative search by an employer "to monitor and supervise the activities of his subordinate," and that it was not part of a criminal investigation of defendant as found by the trial judge.
The police chief testified as to the background of this search and seizure conducted in the early morning hours of August 6, 1974. He had previously begun disciplinary proceedings against defendant based upon unrelated matters. Thereafter the chief received reports of emotional outbursts by defendant and of an assault by defendant upon defendant's wife during a quarrel. The chief claimed that he also received word that defendant was removing some files from his office and had compiled "dossiers"  the gathering of information  on himself, Detective Kelly and a Mr. Senatore of the County Prosecutor's Office. (Mr. Finnegan, an Assistant County Prosecutor, may also have been the subject of a reported dossier.) However, Chief Melleby denied that he was "too concerned" over that information being removed by defendant from his office.
On August 5, 1974, following defendant's alleged assault on his wife, the chief consulted with the city attorney, expressing his concern about further violent outbursts by defendant. McKernan then went to see defendant at defendant's office. At McKernan's suggestion defendant surrendered his service revolver and made an appointment to see a psychiatrist either for therapy or to verify his sanity. McKernan also asked defendant for the alleged dossiers but defendant said he had none. They both then left defendant's office. McKernan returned to the chief's office, handed over defendant's service revolver, reported on defendant's appointment with a psychiatrist and said that the problem was solved.
Despite this the chief said he wanted "to go through" defendant's office. He asked McKernan's opinion as to his right to do so. McKernan said he had that right but there was no point in going there at that hour (it was then 10:30 P.M.), and if there was any fear of defendant removing anything *70 from the office, a guard could be posted at the door until morning. However, this did not satisfy the chief.
The chief called Finnegan and advised McKernan that Finnegan was leaving Margate and was on his way. McKernan asked what Finnegan was going to do and was told that Finnegan would talk to him when he got there. While waiting for Finnegan, McKernan advised the chief against "allowing the prosecutor  for us allowing, accommodating and actually providing entrance into a City office for the prosecutor's office to go through without some kind of a search warrant."
Finally, Finnegan and Senatore arrived. Finnegan said he ought to get into the office and McKernan told him to get a search warrant. It was then midnight. They discussed getting a search warrant the next morning and McKernan said he would not oppose the application. During this discussion efforts were being made to pry open the office door but they were unsuccessful. McKernan's testimony described the events from this point on as follows:
Chief Melleby instructed someone to contact Deputy Chief Ferrari's secretary and order her to come there with the key. So during all this time. As I say, Mr. Finnegan and I were talking, discussing, at times heatedly the entrance of the prosecutor's office into the Deputy Chief's office and Mr. Finnegan was indicating this was an obstruction of criminal investigation and so forth and I said that I really didn't feel that I was obstructing anything; that my task was simply to insure the fact that the City was not opening itself to any kind of liability.
Well, finally, Mr. Finnegan said to me, "I want to tell you that there are, in that office, things which are potentially and immediately damaging to the people of the City of Camden and the people of the County of Camden."
I said, "Well, Jim, what do you mean?"
He said, "Things that could cause, immediately, violence; things that are very damaging at this moment and cannot wait."
I got the distinct feeling that whatever was in there couldn't wait for a search warrant the following morning. I didn't know what to expect to find in there and I said, I can recall distinctly saying to him, "Are you representing this as an attorney and this is the truth?"
He said. "Yes."
*71 I said, "Are you representing this as a member of the prosecutor's office?"
He said, "Yes."
I said, "Well, in the face of that representation, I can see no"  I said, "I think that the City's interest, in protecting itself from civil liability, must, given the emergent situation you have presented, must yield * * *."
So, by this time, Deputy Chief Ferrari's secretary had arrived and she opened the office and that's how we came to be in the office. During the time I was discussing this with Mr. Finnegan, he also talked about the dossiers and the fact that these dossiers were around and I said, Well, I thought that I said, "My problem is not the dossiers. I don't see what the City's interest is in the dossiers. * * *"
The search party consisted of Chief Melleby, Captain Paull of the Camden Police Department, Assistant Prosecutor Finnegan and Senatore of the Prosecutor's Office, with McKernan in attendance. The compartment on one side of the desk was locked and a crowbar or tire iron was obtained and the door was broken open. Piles of paper were removed from the desk and examined. Among them were found the unprocessed traffic tickets.
The trial judge concluded that the search was for evidence of illegal activity on defendant's part and was
* * * part of a criminal investigation and was not mere supervision of defendant's work. * * * Additionally, the suspicion of criminal activity, the forcible entry, and the late hour completely remove from consideration the possibility that those who conducted the search were looking for items necessary to conduct the day-to-day business of the police department." [136 N.J. Super. at 68]
Apparently, after discovering the traffic tickets the searchers left without taking any files or other papers pertaining to the business of the police department. The conclusion of the trial judge that this was a search for incriminating evidence to be used against defendant, and not a private search for the purposes of defendant's employer, is amply supported by the evidence. State v. Johnson, 42 N.J. 146, 162 (1964).
*72 In these circumstances, we have no need to pass upon the right, in the abstract, of a police officer to search the locked office and desk of a subordinate employee for business purposes. Cf. United States v. Bunkers, 521 F.2d 1217 (9 Cir.1975); United States v. Nasser, 476 F.2d 1111 (7 Cir.1973); Shaffer v. Field, 339 F. Supp. 997 (C.D. Cal. 1972), aff'd, 484 F.2d 1196 (9 Cir.1973); United States v. Donato, 269 F. Supp. 921 (E.D. Pa.), aff'd o.b., 379 F.2d 288 (3 Cir.1967).
In these circumstances defendant had a reasonable expectation of privacy against the intrusion into his locked desk by law enforcement officers investigating his possible criminal activity, examining and seizing papers and effects which he kept there. Mancusi v. DeForte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968); United States v. Blok, 88 U.S. App. D.C. 326, 188 F.2d 1019 (1951); see Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).[1] Thus, the State has failed to prove that the warrantless search was a private search by an employer of facilities occupied by his employee. The search and seizure "resulted from unlawful concert of action" on the part of Chief Melleby and Assistant Prosecutor Finnegan. State v. Scrotsky, 39 N.J. 410, 416 (1963). Therefore, defendant's motion to suppress the evidence was properly granted.
Affirmed.
NOTES
[1] In Mancusi the right was upheld despite the fact that the defendant shared his office with other employees. Here, we note, not only was defendant's desk locked, but the door to his office was also locked and only he and his secretary had a key.