**UNITED STATES of America, Plaintiff,**

v.

**Ronald Miller SPEIGHTS, Defendant.**

Crim. No. 76–56.

United States District Court,
D. New Jersey.

May 13, 1976.

Joseph Burns, Asst. U. S. Atty., Newark, N. J., for plaintiff.

Weiner & Sussan, East Brunswick, N. J., for defendant.

OPINION

LACEY, District Judge.

Defendant herein is charged in a one-count indictment with knowingly possessing a sawed-off shotgun that had not been registered to him in violation of 26 U.S.C. §§ 5861(d) and 5871. The matter is presently before the court on the motion by the defendant to suppress the shotgun after it had been discovered during the course of a search conducted of the defendant's locker at police headquarters in New Brunswick, New Jersey.

Mr. Ronald Dixon, an Investigator in the Middlesex County Prosecutor's Office, was told by Investigator Gary Rohen, on or about December 16, 1975, that an informant stated that Officer Ronald Speights had a sawed-off shotgun in his police locker (T35–10 to T36–1). I accept and credit Rohen's testimony in that regard. (T44–16 to T45–7). On December 19, 1975, Police Officer Roberts, who had previously given like information to Rohen, also told Dixon of the existence and location of this weapon. (T36–9 to 14).

On December 19, 1975, upon receipt of the above information, the Middlesex County Prosecutor, Hon. C. Judson Hamlin, went to the office of the New Brunswick Police Chief, Ralph Petrone, who informed Hamlin that the lockers in headquarters belonged to the police department; that they were under the direction and control of the superior officers of the force (T39–12 to T40–12); and that the lockers were primarily for the storage of police equipment. (T42–23 to T43–2). At Hamlin's request, Petrone directed Sergeant Lyon of the Service Department to open eight lockers, including Speights', numbered 26 (T40–22 to T41–1; T68–24).

Sergeant Lyon thereafter obtained a master key and a bolt cutter. The latter instrument was necessary because 40 or

50% of the 113 lockers were secured by personal locks. (T67–8 to 68–5; T71–8 to 22). Indeed, 7 of the 8 lockers Lyon was directed to open, including that of Officer Speights, had to be sawed off before opening. (T71–2 to 6; T69–8 to 16). In addition, the 11 most recent lockers did not have master locks. (T73–9 to 19). However, no permission to use personal locks had been granted (T69–20 to 22), nor had any directive issued ordering that personal locks be removed. (T71–23 to T72–2).

The government concedes that no warrant was obtained prior to the action, that Speights never gave permission for the search of his locker, and that Speights was not present at the time of the search. Rather, according to Chief Petrone, he had the authority to order the search by virtue of his position as Police Chief. (T49–12 to 16). Petrone admitted that there exists no written authority for this exercise of power and that the police officers are not given notice of this fact. (T58–8 to 25).

Petrone further testified that a master key to all lockers was maintained by the Service Department and was available to those police officers who might have misplaced their key. (T49–18 to 21; T50–14 to 20). This was common knowledge throughout the department. (T50–24 to T51–3; T62–15 to T63–11—19; T73–20 to T74–4). Officer Speights acknowledged that he was aware of the existence of the master key. (T75–25 to T76–11). However, he was never informed that anyone could go into his locker where he kept some personal belongings. Indeed, he felt the locker was personal, especially in light of the fact that in 1970 he put his own private lock on the locker, as did many other policemen. (T77–9 to 18). Finally, he said that his locker had not been inspected since he came on the force. The officers were permitted to keep anything they desired in the lockers. (T53–19 to 21); and, many officers placed their own private locks on the lockers and were not required to leave with someone a duplicate key when they did so. (T55–15 to 18).

On one occasion 3 years prior to the events in question, a search was conducted of an officer's locker who, another officer had claimed, was in possession of the latter's weapon. (T49–22 to T50–6). In the past 12 years three or four routine inspections of the lockers were made to check on cleanliness. (T56–23 to T57–4).

As hereinbefore indicated, Speights' locker was searched, and the shotgun was seized, without a search warrant. The government does not quarrel with the proposition that a search and seizure which has been conducted without prior judicial approval is unreasonable *per se* under the Fourth Amendment, absent well-defined exceptional circumstances. *See, e. g., Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854, 858 (1973); *Coolidge v. New Hampshire,* 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564, 576 (1971); *Chambers v. Maroney,* 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419, 428 (1970); *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1969). Nor does the government contend that the search comes within the purview of any of the recognized exceptions to the general rule.

Rather, it is suggested that the Fourth Amendment was inapplicable to the search at bar. Speights contends that the Fourth Amendment protected him from the unlawful search of his locker and seizure of the shotgun discovered therein. The government, on the other hand, maintains that under the circumstances, as revealed at the suppression hearing, Speights could not have a constitutionally justifiable expectation of privacy in the locker assigned to him at police headquarters. *See United States v. White,* 401 U.S. 745, 752, 91 S.Ct. 1122, 1126, 28 L.Ed.2d 453, 459 (1971).

It should be noted that the government does not challenge Speights' contention that he personally believed that the contents of his locker would remain private. Gov't.Br. at 13; Def.Br. at 9. Both parties agree that whether there is a reasonable expectation of privacy under the circumstances is not determined by the actual belief of

Speights. Indeed, cases of this nature inevitably reveal that the movant personally believed that the area wherein the seizure occurred was beyond the intrusion of a search.

Thus, the issue presented is not whether Speights personally felt that his locker would not be searched. Rather, this court must decide whether his expectation of privacy as to the locker was constitutionally justified. *United States v. White,* 401 U.S. at 751–752, 91 S.Ct. at 1125–1126, 28 L.Ed.2d at 458–459. This appears to be an objective standard, *Katz v. United States,* 389 U.S. at 361, 88 S.Ct. at 516, 19 L.Ed.2d at 587 (Harlan, J., concurring); *Kroehler v. Scott,* 391 F.Supp. 1114, 1117 (E.D.Pa.1975), since an expectation of privacy will be justified if society is prepared to recognize it as reasonable. *See United States v. Bunkers,* 521 F.2d 1217, 1219 (9th Cir. 1975); *Patler v. Slayton,* 503 F.2d 472, 478 (4th Cir. 1974); *United States v. Hitchcock,* 467 F.2d 1107, 1108 (9th Cir. 1972).

It is clear, therefore, that the principle enunciated in *White* must be applied on a case-by-case basis. Neither the court's research nor the briefs of counsel have revealed a decision directly on point with the matter at bar. Indeed, many of the comments of counsel with respect to this motion have been made in an attempt to distinguish the cases which have been cited by the parties in support of their respective positions. While those cases do illustrate the manner in which the expectation of privacy issue has been resolved under the circumstances presented therein, in the final analysis I do not find any of those decisions singularly controlling on the matter before me. The cases are important, however, for their analyses of the problem and for the circumstances which were found to be significant in the conclusions reached.

Under all the circumstances, I must conclude that Speights' expectation of privacy regarding his locker was not constitutionally justified. As hereinbefore noted, nearly one-half of all the lockers at police headquarters were secured by locks supplied by the men assigned to the lockers which could only be opened by those men, and that those lockers which were most recently installed could not be opened by a master key. Furthermore, there appears to have been no regulation prohibiting the use of personal locks, nor a requirement that the lockers be accessible through the use of a master key or the disclosure of the combination for those locks constructed with such a mechanism. Finally, the testimony adduced at the hearing indicates that the men placed their own locks on their lockers to further prevent unauthorized entry.

■ This testimony suggests to conclusions with respect to the expectation of privacy: first, that each man who placed his own lock on the locker personally believed that the contents of his locker would remain private; and, second, that the use of private locks by some of the men without protest by their superiors indicated that the department would not seek entry to the lockers without the permission of the men. The first conclusion only indicates that the officers had a personal expectation of privacy. Notwithstanding, as previously noted, such a belief is insufficient to invoke the protection of the Fourth Amendment. The second suggestion, however, is significant in determining whether or not the expectation of privacy, as to those lockers secured by personal locks, was reasonable, and entitled to constitutional protection.

■ That the failure of the department to prohibit the use of personal locks may have indicated acquiescence in the attempt by the men to secure the privacy of their lockers is only one factor to be considered in this inquiry. This court places equal weight on the fact that the lockers are owned by the department; that they were made available primarily for the storage of police equipment; that a master key was available to superior officers; and that the men, including Speights, knew that most of the lockers could be opened through the use of the master key. Furthermore, I do not lose sight of the fact that these lockers were in a police headquarters. The station house is a place where firearms and ammu-

**1224**

nition may be kept, and contraband secured after it has been confiscated by policemen in the proper performance of their duties. Accordingly, conditions exist that make the necessity of a search far more likely than would be the case in a private dwelling, or even some other place of employment. *See Shaffer v. Field*, 339 F.Supp. 997, 1003 (C.D. Cal.1972), *aff'd*, 484 F.2d 1196 (9th Cir. 1973). While the use of private locks may have appeared desirable to prevent the unauthorized use of equipment and personal items contained in the lockers assigned to each officer, no policeman could reasonably expect that his locker would not be subject to search if the need arose.

Additionally, since the lockers were owned by the department, and were merely for the use of the men, a police officer could not assert any property right in the locker in the event that a search was demanded. *Cf. United States v. Donato*, 269 F.Supp. 921, 923–24 (E.D.Pa.), *aff'd*, 379 F.2d 288 (3d Cir. 1967). This court acknowledges that the property interest of the department in the lockers does not determine the appropriate application of the Fourth Amendment. *See, e. g., Cardwell v. Lewis*, 417 U.S. 583, 589, 94 S.Ct. 2464, 2468, 41 L.Ed.2d 325, 334 (1974). However, the ownership of the lockers is properly considered in deciding whether or not Speights' expectation of privacy was reasonable under the facts of this case. Clearly, if the defendant owned the locker, he would be in a better position to expect that his permission would be obtained before a search of the locker was undertaken. Indeed, testimony at the hearing on this motion indicated that lockers had been opened by ranking officers in the past for purposes of inspection.

Accordingly, while Speights may have had an expectation of privacy regarding his locker, I must conclude that under the circumstances set forth above that expectation was neither reasonable nor subject to the protection of the Fourth Amendment. Therefore, the defendant's motion to suppress is denied. Submit an appropriate order.