375 So.2d 364 (1979)
STATE of Louisiana
v.
John WILLIAMS.
No. 63505.
Supreme Court of Louisiana.
May 21, 1979.
*365 Alton T. Moran, Director, Gail H. Ray, App. Counsel, Baton Rouge, for defendant-appellant.
*366 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie B. Brown, Dist. Atty., Doug Moreau, Kay Kirkpatrick, Asst. Dist. Attys., for plaintiff-appellee.
DIXON, Justice.
John Williams was indicted for armed robbery, a violation of R.S. 14:64, and attempted first degree murder, a violation of R.S. 14:27 and R.S. 14:30. He was subsequently found guilty on both counts, and sentenced to serve ninety-nine years and fifty years respectively. On appeal the defense urges seven of ten assignments of error filed below.
On July 27, 1977 the victim was working as an attendant at Kean's Laundry in Baton Rouge, Louisiana when a young black man entered the store and asked for the clothes belonging to John Williams. After checking the clothes filed under "W," she asked for his address because she had clothes for two men named John Williams, one with an address on River Road. When she turned to ask this question, the man grabbed her and demanded money. When the victim tried to flee, the man began stabbing her and then tied a cleaning bag around her neck which made her faint. When police arrived, the victim reported that the offender had asked for John Williams' clothes, and one of the officers who had worked in undercover assignments at the Community Corrections Rehabilitation Center at 500 River Road remembered that a John Williams was staying there. Shortly afterward, the defendant was arrested at the rehabilitation center.

Assignment of Error No. 1
In his first assignment of error, the defense complains of the trial judge's ruling on a written request that the judge permit defense counsel to ask a list of questions to prospective jurors.
The record does not disclose whether this written request was an effort by defense counsel to obtain an advance ruling on certain questions, or whether the trial judge had requested that counsel submit a list of questions to the court. Nevertheless, there was no categorical ruling on the request. In response to the request, the trial judge stated that it was the duty of the court to instruct the jury on the law, and, generally, the duty of the lawyer to interrogate the prospective jurors as to their qualifications. Nevertheless, the judge recognized that some principles of law might not be acceptable to the prospective jurors, and that defense counsel would be permitted, in some cases, to probe the jurors to determine whether they were biased or prejudiced against certain principles. The court also instructed defense counsel that if he wished to probe the jury further, he should make the effort, and that he would not be stopped by the judge unless it was necessary.
Article 1, § 17 of the Louisiana Constitution assures a criminal defendant "the right to full voir dire examination of prospective jurors and to challenge jurors peremptorily." Counsel in a criminal case is allowed a wide latitude in voir dire examination, and the scope of inquiry is best governed by a liberal discretion on the court's part. State v. Hayes, 364 So.2d 923 (La.1978); State v. Jones, 282 So.2d 422 (La.1973). The object of examining a prospective juror is to discover bases for challenges for cause and to secure information for the intelligent exercise of peremptory challenges. State v. Drew, 360 So.2d 500 (La.1978); State v. Hills, 241 La. 345, 129 So.2d 12 (1961).
In the instant case the defense did not object to the judge's pretrial interrogation of the jurors. His examination was full, complete, fair; his instructions on the law were correct. Only two objections were made by the defense during the course of voir dire. The defense first objected to the judge's pretrial instructions to the jury concerning the meaning of not guilty and not guilty by reason of insanity. However, the defense neither briefed nor argued this assignment on appeal and it is therefore deemed abandoned. The defense also objected to the prosecution's inference that Williams was indigent, but this assignment *367 of error lacks merit for the reasons stated elsewhere in the opinion. Although the defense was stopped twice in the course of its voir dire examination, in neither instance did the defense object or assign error, and the trial court's restriction in both instances was proper.[1] The record therefore reveals that the defendant was afforded the full voir dire examination secured to him by the constitution and jurisprudence.
There is no merit in this assignment of error.

Assignment of Error No. 3
By this assignment, the defense contends that the trial court erred in denying its motion for a mistrial which was warranted by the prosecutor's questioning of a prospective juror which obliquely implied that the defendant was indigent.
After a prospective juror had indicated that she knew defense counsel's brother, the following colloquy occurred between the prosecutor and the juror:
"Q Okay. You know, that Mr. Weimer, of course, is not on trial here today.
A I understand.
Q . . . you're a school teacher, I believe you said.
A Yes.
Q And as a school teacher, you have to teach the students that come into your classroom at the beginning of the year. You have no choicemaybe you do a little bit, but you really have no choice as to the students in your classroom. You're sort of stuck with what you get.
A Yes, sir.
Q Well, Mr. Weimer in this caseI think the Court has pointed outis the defense attorney, of course, and he was *368 appointed in this, and what he's going to say . . . ."
Defense counsel objected at this point, and argued that the jury's knowledge of the defense counsel's appointed status prejudiced the defendant because of the inference of indigency. The trial court disagreed and denied the motion, but admonished the veniremen concerning the prosecutor's remarks. The trial court later allowed the defense to poll the entire jury individually, even those jurors already sworn, to determine whether the jurors were prejudiced against indigent defendants; no one indicated any such bias.
The trial judge is required to grant a mistrial if certain comments are made concerning race, religion, color or national origin; inadmissible other crimes allegedly committed by defendant; the failure of defendant to testify in his own defense; and the refusal of the trial court to direct a verdict. C.Cr.P. 770. When a prejudicial comment outside the scope of C.Cr.P. 770 is made, C.Cr.P. 771 provides that the trial judge may admonish the jury and may grant a mistrial if the admonition is not sufficient to assure the defendant a fair trial.
A mistrial is a drastic remedy and, unless mandatory, C.Cr.P. 770, is warranted only when trial error results in substantial prejudice to a defendant which deprives him of the reasonable expectation of a fair trial. State v. Robinson, 342 So.2d 183 (La. 1977); State v. Overton, 337 So.2d 1058 (La.1976). In the present case, defendant was not substantially prejudiced by the prosecutor's remark. The statement, if properly characterized by defense counsel, was at the most an indirect reference to defendant's indigency which was cured by the court's admonition. The defense was also afforded the opportunity to question all the prospective jurors, and even those already sworn, concerning any possible prejudice caused by the defendant's indigency. In this context, it is clear that the trial court was correct to deny the motion.
This assignment is without merit.

Assignment of Error No. 4
In this assignment, the defense alleges error because the trial court refused to grant a mistrial as a result of the introduction of an extraneous offense without adequate notice to the defense.[2]
At trial the victim testified that she was robbed, stabbed and strangled by her assailant. The prosecutor then asked the witness what happened next, and she replied that she had been raped. Defense counsel objected and requested a mistrial because he had not been given notice before the State's opening statement that it intended to introduce evidence of this extraneous offense. The trial court denied the motion but admonished the jurors that the accused was on trial for armed robbery and attempted murder and that they should not consider any other offenses except as they related to other issues in this case. In brief the defense argues that the offense of rape was inadmissible because the State gave no notice and because there was no clear and convincing evidence of the rape. In the alternative, the defense argues that a balancing of probative value and prejudicial effect is required if the offense is considered a part of the res gestae.
In State v. Prieur, 277 So.2d 126 (La.1973), this court required the prosecution to give the defense notice of its intention to introduce other crimes evidence. However, such a notice is not required if the additional offenses were part of the res gestae. R.S. 15:447-448; State v. Boyd, 359 So.2d 931 (La.1978); State v. Flowers, 337 So.2d 469 (La.1976). R.S. 15:448 defines res gestae in the following manner:
"To constitute res gestae the circumstances and declarations must be necessary *369 incidents of the criminal act, or immediate concomitants of it, or form in conjunction with it one continuous transaction."
In the present case, the "extraneous offense" of rape was committed in the course of other offenses for which defendant was on trial. The rape was an immediate concomitant of the charged offenses, forming one continuous transaction. The rape was not an extraneous offense but part of the res gestae of the charged offenses, and a Prieur notice was therefore unnecessary. Clear and convincing evidence of the rape was also unnecessary because it formed part of the res gestae. In addition, this court has held that evidence of other crimes which are part of the res gestae is admissible without balancing the probative value of the evidence against its prejudicial effect. State v. Wilson, 363 So.2d 481, 485 (La.1978). The trial court did not commit error in denying the motion for mistrial.
This assignment is without merit.

Assignment of Error No. 5
By this assignment, defendant contends that the trial court erred in denying his motion to suppress the victim's in-court identification because it was tainted by an abortive attempted pretrial identification of the defendant.
Before trial the victim was shown some photographs which included the defendant's picture, but was unable to make an identification. At trial she positively identified the defendant as her assailant. Before overruling the defense motion to suppress the in-court identification, the judge permitted the defense to question the victim concerning the picture line-up. She stated that the photographs did not really look like the defendant, and that she could not remember until she saw him in person at trial when she was able to make a positive identification. In brief the defense argues that the pretrial photographic procedure used by the State was unnecessary because the defendant was in custody and was so tainted that the in-court identification of defendant should be inadmissible. The defense also contends that the defendant was the only young black male at the defense table which rendered suspect an in-court identification of him. Finally, the defense argues that State v. Wallace, 285 So.2d 796 (La. 1973), should be controlling.
A review of the Wallace case is convincing that its facts are inapposite to the instant case. In Wallace, the victim's in-court identification of the defendants was based on a photographic line-up during which the police informed the victim that the defendants' pictures were among those to be viewed. No similarly improper techniques are revealed by this record despite the opportunity given to the defense to question the victim. Moreover, in Wallace the in-court identification was based on the photographic line-up; in the present case, the victim was unable to identify the defendant from his photograph.
Even if suggestive identification procedures are proven by the defense, it is the likelihood of misidentification, and not the mere existence of suggestiveness, which violates due process. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); State ex rel. Fields v. Maggio, 368 So.2d 1016 (La.1979). In State v. Guillot, 353 So.2d 1005 (La.1977), this court indicated that it would employ the five factors articulated in Manson v. Brathwaite, supra, to balance the corrupting effect of a suggestive identification. We must therefore evaluate: the witness' opportunity to view the crime; the degree of attention paid by the witness; the accuracy of any prior description; the level of certainty displayed at the confrontation; and the amount of time between the crime and the confrontation.
In the present case, the crime occurred during the day in a lighted commercial establishment. Before the robbery, the victim's assailant stood face to face with her and acted like a customer conducting business; he made no attempt to obscure his features. The victim and the defendant then engaged in a protracted struggle which gave the victim ample opportunity to *370 observe him. The victim later remembered previous contacts with the same person. Although seven months elapsed between the crime and the trial, the victim's identification was unequivocal. These factors indicate that her in-court identification had a basis independent of any alleged, but unspecified, improprieties committed during the photographic line-up. State v. Siegel, 354 So.2d 525 (La.1978); State v. Taylor, 347 So.2d 172 (La.1977). It is also evident that the independent source of the victim's identification cures any possible suggestiveness engendered by the defendant's being the only black man at the defense table.
The defense has also relied on a statement in Wallace for the proposition that photographic line-ups are rarely justified if the defendant is in custody. However, the defense has cited no authority requiring the suppression of an independently based in-court identification merely because a witness was shown pictures of the defendant in a photographic line-up rather than viewing the defendant in the flesh.
This assignment is without merit.

Assignments of Error Nos. 7 and 8
By these assignments, the defense alleges that the trial court erred in denying its motion to suppress articles seized from drawers in the defendant's room at the rehabilitation center where he was staying, and in subsequently admitting the evidence which was not shown to have been in the defendant's exclusive control.
After Williams was arrested, the police contacted the supervisor of the work release program at the Community Corrections Rehabilitation Center where the defendant had been staying to notify him of the arrest and that Williams had asked for some of his belongings. The supervisor then took the defendant some of his belongings while he was in jail. Upon returning the supervisor searched the defendant's assigned top dresser drawer which had a lock and his other three drawers of the same dresser which could have been used by other residents at the center. This search was conducted pursuant to the center's general policy that when a resident left without taking all of his belongings, his personal effects were packed up and stored to prevent theft by the other residents. During this second search, the supervisor found three or four rolls of coins wrapped in a bandanna which appeared to have blood on it. Later these items were given to the police and admitted at defendant's trial.
The defense argues that these items should have been suppressed because they were seized in an illegal search conducted by a governmental official. Pretermitting whether the supervisor was a governmental official, we must consider whether the Fourth Amendment to the United States Constitution or Art. 1, § 5 of the Louisiana Constitution of 1974 protects the defendant's expectation of privacy in a rehabilitation center.
The Fourth Amendment and Article 1, § 5 protect an individual's expectation of privacy, rather than specific places. See Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); State v. Lamartiniere, 362 So.2d 526 (La.1978). In Lamartiniere, supra, this court looked to Justice Harlan's basic test for measuring the person's "expectation of privacy:"
"`. . . My understanding of the rule that has emerged from prior decisions is that there is a two-fold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as `reasonable.'. . .'" (Harlan, J., concurring). 362 So.2d at 528.
If there is no expectation of privacy, an individual's right to privacy cannot be violated, and a search of such a place is not unreasonable and not unconstitutional.
Although this court has not previously considered what expectation of privacy is reasonable for a resident of a rehabilitation center, this issue was recently addressed in United States v. Lewis, 400 F.Supp. 1046 (DCNY1975). In Lewis, the court upheld the warrantless search of a room at the Bayview Correctional Facility *371 which was conducted to secure the defendant's possessions when it was clear he would not be returning. The court noted that the facility was not an ordinary prison facility but a halfway house which partook of the attributes of both a correctional facility and a structured or sheltered residence. Although its function in the correctional system was to provide a supervised and restricted environment for evaluating the convict's ability to function in society, it still fulfilled the functions of a penal institution in its concern for security and rehabilitation. The court reasoned that the privileges enjoyed by a resident of a halfway house were neither the same as those of an ordinary citizen, nor as restricted as those of an inmate in a more secure correctional facility:
". . . The Fourth Amendment affords protection only against searches that are unreasonable and what is unreasonable for a resident of a halfway house differs from what is unreasonable for an ordinary citizen. See United States ex rel. Santos v. New York State Board of Parole, 441 F.2d 1216 (2d Cir. 1971), cert. denied, 404 U.S. 1025, 92 S.Ct. 692, 30 L.Ed.2d 676 (1972); United States ex rel. Randazzo v. Follette, 418 F.2d 1319 (2d Cir. 1969), cert. denied 402 U.S. 984, 91 S.Ct. 1672, 29 L.Ed.2d 150 (1971); People v. Randazzo, 15 N.Y.2d 526, 254 N.Y.S.2d 99, 202 N.E.2d 549 (1964). See also, United States v. Grisby, 335 F.2d 652 (4th Cir. 1964).
Lewis' right to privacy is only slightly greater in regard to those articles which he kept in his locker than those kept in the doorless room. Still, the exigencies of life in a quasi-penal institution require that a locker be inspected for contraband on appropriate occasions and that it be cleaned out when a resident absents himself by reason of his arrest by another jurisdiction. This intrusion upon Lewis' right to privacy was reasonable under the circumstances and was fully supported by the necessities of a reasonable regimen of the orderly operation of a correctional facility. See generally, Shaffer v. Field, 339 F.Supp. 997 (C.D.Cal.1972), aff'd, 484 F.2d 1196 (9th Cir. 1973); United States v. Donato, 269 F.Supp. 921 (E.D.Pa.), aff'd on opinion below, 379 F.2d 288 (3d Cir. 1967); People v. Overton, 20 N.Y.2d 360, 283 N.Y.S.2d 22, 229 N.E.2d 596 (1967)." 400 F.Supp. at 1048-1049.
In the instant case, the Community Corrections Rehabilitation Center was a quasi-penal institution, or a halfway house. The supervisors had keys to the residents' lockers and periodically inspected the lockers and drawers. The general policy was to clean out the lockers and drawers when a resident left permanently without taking his belongings. Under these circumstances, the defendant had no reasonable expectation of privacy, and the search of his locker and drawers was not unconstitutional.
The defense also contends that the items were not in defendant's exclusive possession or control, apparently with reference to the items taken from the three bottom dresser drawers that were not locked and were accessible to other residents. The record is unclear whether the supervisor found the bandanna and rolls of coins in a locked drawer. However, even if the items seized were not taken from the locked drawer, they may be admitted if it is established that they are probably connected with the case. The lack of positive identification goes to the weight of the evidence, rather than to its admissibility. State v. Drake, 319 So.2d 427 (La.1975); State v. Freeman, 306 So.2d 703 (La.1975).
In the instant case, the dresser was at least partially used by Williams to store his belongings. Although other residents could have used the bottom three drawers, all of the items found in the drawers belonged to the defendant, and the bandanna in which the rolls of coins were wrapped was identified by another resident of the institution as having been owned and frequently worn by the defendant. There was clearly a sufficient connection between the defendant and these items to permit their introduction at trial.
These assignments lack merit.

*372 Assignment of Error No. 9

By this assignment, the defense alleges that the trial court erred in overruling its objection to allegedly improper remarks made by the prosecutor.
During closing argument, defense counsel stressed the victim's inability before trial to identify the defendant, her sudden recognition of him seven months after the offenses, the lack of evidence concerning the identity of the other John Williams, and the possibility that the other John Williams or another person committed the offenses. The prosecution argued in rebuttal:
"This other John Williams. Well, no other John Williams was here. No other John Williams had blood soaked money with Type O in his pocket. No other John Williams had blood on his shoes, granted. The lady told you because of the substance of the rubber she couldn't tell whether it was human or not, but it was blood. The other John Williams had no access to the weapon that four people testified to was readily available to those people at CCRC. As a matter of fact, one of them said he'd seen Mr. Williams with one like it, laying on his bed. Reasonable doubt? This other John Williams was not identified by (the victim) today in the courtroom. Remember I told you earlier when we were picking you, . . . . that it's your duty to collectively evaluate all of the evidence? I don't know whether you saw it or not, but some of you may have caught it; and if you did, I hope you tell it to the other jurors, the way (the victim) came in and looked and reacted when she saw that defendant."
The defense objected to the last statement on the grounds that the only evidence the jury may consider comes "from the witness chair," but did not request either an admonition or a mistrial.
C.Cr.P. 774 defines the permissible scope of argument, and provides:
"The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice.
The state's rebuttal shall be confined to answering the argument of the defendant."
However, C.Cr.P. 774 provides no sanction for its violation; the proper remedy is found in C.Cr.P. 770 and C.Cr.P. 771. See C.Cr.P. 774, Official Revision Comment (c) and State v. Lee, 340 So.2d 180 (La.1976). The requisites for a mandatory mistrial under C.Cr.P. 770 have not been met in this case, and therefore the defense was entitled at most only to an admonition which it did not request. This court has consistently held that the trial court commits no error in failing to admonish the prosecution if there has been no request for an admonition. State v. Lee, supra, at 187 and the cases cited therein. Moreover, the trial judge cured any possible prejudice to the defendant by charging the jury to ignore any non-verbal communication except the witness' demeanor. It is therefore clear that the trial court was correct to deny the motion for mistrial.
This assignment lacks merit.
For the reasons assigned, the conviction and sentence of John Williams are affirmed.
NOTES
[1] The first time Mr. Weimer, one of the defense counselors, was stopped when one of his questions appeared to ask the prospective juror to commit her verdict in advance at trial:

"BY MR. WEIMER:
Q Miss Munson, I'm a little concerned about your answers to the Judge's questions. I'd like to ask you this.
A (Munson) Yes, sir.
Q If the StateI'm not saying that this will actually happen, but if the State were to prove by such strong evidence as to leave no doubt in your mind that this defendant committed this crime and the defense were to show by reasonable preponderance of the evidence that he was insane at the time of the commission of the crime, could you acquit him?
THE COURT: Wait a minute. Don't answer that. Mr. Weimer, Mr. Thomson, Mr. Marabella.
(Reporter's note: Counsel for the accused and for the State approach the bench and confer with the Court.)
BY THE COURT:
Q Miss Munson, I interrupted Mr. Weimer becausehe has correctly stated the law. You have the obligation, if you find the defendant not guilty, to vote not guilty; if you find him guilty, to vote guilty. You're not required to tell us in advance what your verdict would be. You haven't heard any facts. It's a hypothetical question on the issue which you must resolve, the issue of guilt or innocence and the issue of sanity if raised; and he simply asked you, in effect, would you follow the law. You've already told me that you will."
The second time Mr. Thomson, the other defense counselor, was stopped when a prospective juror indicated confusion concerning the law:
"BY MR. THOMSON:
. . . The jury must, or the State, excuse me, must prove to you to a moral certainty beyond any reasonable doubt that the defendant in this case perpetrated the crime, and what I'm worried about is whether or not the associations or pressures that you might feel might affect this burden of proof; and, well, as you can understand, defense counsel is very much . . .
A I agree, but this isyou know, this isthis isI mean, in your aspect of the case on the preponderance, this is where you getyou talking about the tilting of the scale, however so slight, in either direction. If I have somethingyou know, and at the present, I don't but . . .
THE COURT: Let me interrupt, Mr. Thomson. This is why I don't allow questions about the law to jurors and argument back and forth. They cannot be expected to understand this in detail.
BY THE COURT:
Q The preponderance-of-evidence test, Mr. Cooper, only applies to the issue of insanity.
A Yes, sir.
Q The proof-beyond-a-reasonable-doubt test applies to the question of guilt or innocence. I think Mr. Cooper has stated as succinctly as any layman can his appreciation of the law at this stage, and I think the further ask him questions becomes more argumentative than informative."
[2] When defense counsel made his objection he argued that he had not been given a notice pursuant to C.Cr.P. 768 and C.Cr.P. 769. However, C.Cr.P. 768 requires that the State give notice only of its intention to use a confession or inculpatory statement at trial. C.Cr.P. 769 concerns evidence not fairly within the scope of the opening statement of the State. For purposes of this assignment, we presume the defense refers to a Prieur notice.