# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | ID No. 2409008211 |
| | ) | |
| CYNTHIA VIQUEZ, | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: July 17, 2025
Decided: July 28, 2025

*Upon Defendant Cynthia Viquez's Motion to Suppress*
**DENIED**

## ORDER

Ipek Kurul, Esquire, Brianna Mills, Esquire, Deputy Attorneys General, DEPARTMENT OF JUSTICE, 820 North French Street, 7th Floor, Wilmington, DE 19801, Attorneys for the State.

Erika LaCon, Esquire, Matthew Keating, Esquire, Assistant Public Defenders, OFFICE OF DEFENSE SERVICES, 820 North French Street, 3rd Floor, Wilmington, DE 19801, Attorneys for Defendant.

**WHARTON, J.**

This 28th day of July 2025, upon consideration of Defendant Cynthia Viquez's ("Viquez") Motion to Suppress,[1] the State's Response to Defendant's Motion to Suppress ("State's Response"),[2] and the suppression hearing held on July 17, 2025,[3] it appears to the Court that:

1. On September 3, 2024, a concerned neighbor contacted Wilmington police to request a welfare check of Leonor Gonzalez Ortiz ("Ortiz"), the homeowner of 402 S. Jackson Street.[4] The neighbor called the police after the neighbor had not seen Ortiz for a few days and became concerned that she was not following her daily routine.[5]

2. At the time, Viquez and Luis Burgos ("Burgos") were living at Ortiz's home as renters.[6] When the police officers arrived at Ortiz's home for the welfare check, Viquez was not there, but the police obtained Viquez's cell phone number from the neighbor.[7] The officers called Viquez and she told them that she was dropping off a friend at the bus stop and would return to meet them soon.[8]

---

[1] D.I. 12.
[2] D.I. 16.
[3] D.I. 21.
[4] State's Resp. at 1, D.I. 16.
[5] *Id*.
[6] *Id*. at 1-2.
[7] *Id*. at 2.
[8] *Id.*

3.    Viquez returned to the residence and met with the officers.[9]   She claimed that she spoke to Ortiz that morning.[10]   She then voluntarily let the officers inside the residence.[11]   Upon entering the residence, the officers immediately noticed that it was unusually cold inside.[12]   The officers noted that the thermostat was set to 60 degrees, and the temperature inside the house was also showing 60 degrees.[13]

4.    The officers were unable to locate Ortiz after looking through the first and second floors of the house.[14]   The basement door was locked and barricaded with clothes.[15]   The officers requested Viquez to unlock the door to allow them to search the basement.[16]   Viquez originally told the officers that she did not have a key to the basement door and Burgos locked it and took the key.[17]   Shortly after this exchange, the officers obtained Viquez's key chain and located the basement key on it.[18]   The officers used the key to unlock the basement door and enter the basement.[19]

---

[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id*. at 2-3.
[19] *Id*. at 3.

5. The officers discovered a "makeshift coffin" used to conceal Ortiz's body in the basement.[20] It consisted of pieces of miscellaneous wood and piles of clothes and blankets with Ortiz's feet protruding from the bottom of the pile.[21]

6. Prior to the officers locating Ortiz's body, Viquez told them that Ortiz was fine and that she was located in Columbia when she spoke to her that morning.[22] Viquez offered to call and did call Ortiz's contact number in Columbia.[23] A man answered the phone.[24] One of the officers asked the man to put Ortiz on the phone.[25] The man claimed Ortiz was asleep and refused to wake her up at the request of the officer.[26]

7. Once the officers went into the basement, Viquez became visibly upset and started to cry.[27] It was at this time that she began to intimate that Ortiz was deceased.[28] Viquez kept telling the police that she could not lose her grandmother after also losing her mother and son.[29]

---

[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.* at 4.

8.      Viquez started to implicate Burgos in Ortiz's death during her post-*Miranda* interview with Det. Kane at the Wilmington police station.[30]  Viquez volunteered that she had two phones: her iPhone and a phone given to her by the "NYPD."[31]  She told Det. Kane that she gave Burgos her "NYPD" phone.[32]  Soon after the start of the interview, Viquez said Burgos was using her iPhone to write texts during the timeframe in question.[33]  She said that Burgos texted her new boyfriend, Martin Johnson ("Johnson"), about hitting Ortiz.[34]  Viquez also said Burgos was trying to make it look like she was the one who killed Ortiz.[35]

9.      Det. Kane requested permission to search Viquez's iPhone.[36]  Det. Kane told Ortiz, "I'm just interested in these text messages, and anything related to what we are talking about, okay?"[37]  Det. Kane addressed Ortiz's questions about the download.[38]  He made it clear several times that police would download the entire contents of the iPhone.[39]

---

[30] *Id.* (A transcript of portions of that interview relevant to the motion is attached to the State's Response as Ex. A.  It was also introduced as State's Ex. 2 at the suppression hearing.  A corresponding video was introduced as State's Ex. 1.)
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.* at 4-5 (quoting Ex. A, 34:32-36).
[38] *Id.* at 5.
[39] *Id.*

10. Viquez asked Det. Kane questions, including, "[a]re you guys able to see everything like, you know, as in like messages that he wrote?"[40] Det. Kane answered in the affirmative.[41] Viquez wanted to know if they would be able to see deleted content regarding anything that Burgos may have deleted on her phone.[42] Again, Det. Kane answered in the affirmative.[43]

11. Viquez also seemed concerned about the sexual content on her phone, and Det. Kane told her that he would not look at any sexual content.[44] Det. Kane added, "[t]he sole purpose of us handling this phone is for us to get stuff that has to do with what's going on with your grandma, okay?"[45] Viquez said, "I need to explain to you exactly what's in there, too."[46] Even though Det. Kane confirmed at times throughout the interview that he would be looking at messages, he also repeated, "the only thing we'll be searching is just searching the phone[.]"[47]

12. Viquez volunteered in the interview that Burgos kept using cleaning products in the house, told her to not go into the basement, and mentioned how the house felt so cold.[48] Viquez provided more areas of the phone to search as she

[40] *Id*. (quoting Ex. A, 37:27-30).
[41] *Id*. at 5.
[42] *Id*.
[43] *Id*.
[44] *Id*.
[45] *Id*. (quoting Ex. A, 41:4-8).
[46] *Id*. (quoting Ex. A, 41:18-19).
[47] *Id*. (quoting Ex. A, 45:19-20).
[48] *Id*. at 5.

implicated Burgos in the commission of the crime.[49] For example, she responded to a question by Det. Kane about Google searches by stating that she searched "[h]ow long would it take if [Burgos] did something to [Ortiz]?"[50]

13.     Viquez signed the consent form after reviewing it with Det. Kane.[51] The State asserts that Viquez did not put any limitations on the consent to search her iPhone and points out that she included her password on the form.[52] The State also asserts that Viquez's consent to search was voluntary and knowing.[53]

14.     After signing the consent form, Viquez showed Det. Kane numerous incriminating text messages on her phone between her and Johnson.[54] These text messages discussed the sight of bruises and cuts on the body where Viquez allegedly hit Ortiz, the fact that no one else had access to the house, and that the body was starting to cause an odor.[55]

15.     The police downloaded the entire content of Viquez's iPhone pursuant to the consent form.[56] The police then located various types of data that were related

---

[49] *Id.* at 5-6.
[50] *Id*. at 6 (Ex. A, 47:9-10).
[51] *Id*. at 6 Ex. B and suppression hearing State's Ex. 3).
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] *Id.*
[56] *Id.*

to what happened to Ortiz.[57] It included text messages, Google searches, and Facebook messages between Viquez and Burgos.[58]

16.    On September 16, 2024, Det. Kane also applied for and received a warrant to search the contents of Viquez's iPhone including text messages, call logs, web browsing activities, and social media.[59]

17.    On May 30, 2025, Viquez filed the Motion to Suppress pertaining to all social media evidence on her iPhone.[60] The State's Response was filed on June 24, 2025.[61] The Court held a suppression hearing on July 17, 2025.[62]

18.    Viquez moves to suppress all social media evidence seized pursuant to the search warrant.[63] She asserts that the search warrant fails to establish a nexus between the charged offenses and the social media on her iPhone.[64] She states that the search warrant violates her rights under the Fourth and Fourteenth Amendments of the United States Constitutions, Article I § 6 of the Delaware Constitution, and Delaware case law.[65]

---

[57] *Id.*
[58] *Id.*
[59] *Id.* at 7.
[60] D.I. 12.
[61] D.I. 16.
[62] D.I. 21.
[63] Viquez's Mot. at 6, D.I. 12; *see also* State's Resp. at n.20, D.I. 16.
[64] Viquez's Mot. at 6, D.I.12.
[65] *Id.* at 1.

19.    In particular, Viquez argues that the search warrant runs afoul of *Terreros v. State* which established that probable cause is required for each individual type of evidence that is searched for on a phone.[66]   She states that, similar to *Buckham v. State*, the warrant fails to specify how the social media on the phone was actually used as part of a criminal scheme.[67]   Viquez adds that any alleged nexus merely would be the hope that something incriminating could be found to be used at trial.[68]   Lastly, the warrant does not offer any evidence to suggest that social media was used during, or to aid, in the commission of crimes.[69]

20.    The State opposes the Motion to Suppress.[70]   The State concedes a lack of a nexus to social media in the warrant,[71] but asserts that under the totality of the circumstances, Viquez provided a valid consent for an unlimited search of the digital contents of her iPhone.[72]   The State equates this case to *State* v. *Blackwood*[73] in that there was not limiting language in either Viquez's consent or Det. Kane's assertions leading to her consent.[74]

---

[66] *Id.* at 6.
[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] State's Resp. at 8, D.I. 16.
[71] *Id.* at 7.
[72] *Id.*
[73] *State v. Blackwood*, 2020 WL 975465, (Del. Super. Ct. Feb. 27, 2020), *aff'd*, 2020 WL 6629581 (Del. 2023).
[74] State's Resp. at 10, D.I. 16.

21.     On a motion to suppress evidence collected pursuant to a warrant, the defendant bears the burden of proving that the search violated his rights under the U.S. Constitution, the Delaware Constitution, or Delaware statutory law.[75]  The defendant must prove his rights were violated by a preponderance of the evidence.[76]

22.     The United States and Delaware Constitutions protect the right of persons to be secure from "unreasonable searches and seizures."[77]  A warrantless search is deemed *per se* unreasonable unless that search falls within a recognized exception.[78]  One recognized exception is a search conducted with a person's voluntary consent.[79]  To be deemed "voluntary," consent need not be "knowing and intelligent,"[80] but it cannot be the product of coercion by threat or force.[81]  Whether or not consent was given voluntarily is determined by examining "the totality of the circumstances surrounding the consent, including (1) knowledge of the constitutional right to refuse consent; (2) age, intelligence, education, and language ability; (3) the degree to which the individual cooperates with police; and (4) the

---

[75] *Blackwood* 2020 WL 975465, at *2.
[76] *Id.*
[77] U.S. Const. amend. IV; Del. Const. art. I, § 6.
[78] *Cooke v. State*, 977 A.2d 803, 854 (Del. 2009) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)).
[79] *Cooke*, 977 A.2d at 855 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).
[80] *Id.* (citing *Schneckloth*, 412 U.S. at 241).
[81] *Higgins v. State*, 2014 WL 1323387, at *2 (Del. Supr.) (citing *Schneckloth*, 412 U.S. at 233).

length of detention and the nature of questioning, including the use of physical punishment or other coercive police behavior."[82]  The State bears the burden of showing that consent was voluntarily given.[83]

23.    The scope of a consented-to search is governed by the language used in the consent.[84]  The Court must determine what a typical, reasonable person would have understood by the exchange between the officer and the suspect.[85]  The Court must determine the scope of a Defendant's consent.[86]

24.    Viquez's consent is evidenced by the consent form[87] and transcript of the September 3, 2024, interview with Det. Kane.[88]  There is no language on the consent form to suggest any limitation on the scope of the search of the digital contents of her iPhone.  The consent form is titled Authorization to Search and Seize Property.[89]  The written description on the form of the property to be searched states an iPhone 11 in black & leopard case belonging to Cynthia Viquez.[90]  She wrote her

---

[82] *Cooke*, 977 A.2d at 855.
[83] *Higgins*, 2014 WL 1323387, at *2 (citing *Schneckloth*, 412 U.S. at 222).
[84] *State v. Ellis*, 1991 WL 247729, at *2 (Del. Supr.) (quoting *Ledda v. State*, 564 A.2d 1125, 1129 (Del. 1989)).
[85] *Blackwood*, 2020 WL 975465, at *6 (citing *United States v. Tarburton*, 610 F. Supp. 2d 268, 275 (D. Del. 2009)).
[86] *Blackwood*, 2020 WL 975465, at *6.
[87] Viquez's Mot. at Ex. A, D.I. 12.
[88] State's Resp. at Ex. A, D.I.16.
[89] Viquez's Mot. at Ex. A, D.I. 12.
[90] *Id.*

password to the iPhone in the description section of the form as well.[91]  She signed the consent form during the interview with Det. Kane on September 3, 2024.[92]

26.    The State points out the following in relation to Viquez's consent that took place during the interview: Det. Kane read Viquez her *Miranda* rights and reviewed each section of the warnings with her.[93]  She answered that she understood each section and agreed to talk to Det. Kane.[94]  In their discussion, Viquez began to implicate Burgos and the contents of her iPhone in the killing of Ortiz.[95]

27.    Det. Kane told Viquez that he would get a search and seizure form for the search of her iPhone.[96]  Det. Kane instructed her that he would download the entire contents of the phone if she gave consent.[97]  Det. Kane stated that while he is not interested in "everything" on the phone, he will still obviously need to look at that "stuff[.]"[98]  Viquez affirmed with "[y]es."[99]

28.    Det. Kane returned with the consent form and explained to Viquez that it is her right to refuse the search, to which she responded that she understood.[100]  At

---

[91] *Id.*
[92] *Id.*
[93] *Id*. at 8-9.
[94] *Id*. at 9.
[95] *Id.*
[96] *Id.*
[97] *Id.*
[98] *Id.* (quoting Ex. A, 34:18-22).
[99] *Id.* (quoting Ex. A, 34:24).
[100] *Id.* at 9.

one point, she mentioned feeling uncomfortable with the download because Burgos "is really making me look bad" and "has her scared."[101] She asked if a lawyer could perform the download instead.[102] Det. Kane stopped and discussed the process with her at that point.[103] She accepted the police download after this discussion and followed the exchange by volunteering "the Safari was me."[104] Safari is a search engine. Throughout the conversation, she implicated more parts of her iPhone in the crime.[105]

29. To prove voluntary consent, the State posits the following: (1) Det. Kane read the consent form line by line with the Viquez, explaining numerous times that she had the right to refuse; 2) Viquez is approximately 39 years old, has experience with the criminal justice system, and is bilingual; 3) Viquez stated numerous times that she wanted to cooperate, consented to the search, claimed she wanted to explain her texts to Det. Kane, and asked questions throughout the lengthy exchange about consent, but never asked to limit the search to certain types of evidence or certain parts of the phone; and (4) the interview was more than seven hours long, not because Det. Kane was forcing Viquez to talk, but because Viquez was more than willing to tell her side of the story in an attempt to dissuade police of

---

[101] *Id.* (quoting Ex. A, 43:7-35).
[102] *Id.* at 9.
[103] *Id.*
[104] *Id.* (quoting Ex. A, 45:13-14).
[105] *Id.* at 9.

her guilt.[106]  Despite the interview's length, Viquez consented to the search less than one hour into it.[107]

30.    The Court finds that the State has met its burden of showing by a preponderance of the evidence that Viquez voluntarily consented to the search of the entire contents of her iPhone.  In considering the totality of the circumstances, the factors listed by the State provide ample evidence for this determination.  The Court also finds that the language on the consent form allows for a search of the contents of the iPhone that is unlimited in scope.  The unlimited scope of consent permits the search of the social media evidence on her iPhone that she seeks to suppress.

THEREFORE, for the reasons set forth above, Defendant Cynthia Viquez's Motion to Suppress is **DENIED**.

**IT IS SO ORDERED.**

/s/ *Ferris W. Wharton*
Ferris W. Wharton, J.

---

[106] *Id*. at 11-12.
[107] *Id.* (Ex. A at 48:1-49:42).

14